**UNITED STATES of America, Appellee,**

v.

**Matthew YIP, Defendant–Appellant.**

**No. 489, Docket 89–1223.**

United States Court of Appeals,
Second Circuit.

Argued Oct. 2, 1990.

Decided April 4, 1991.

owed on those goods, is not a criminal act within the meaning of § 542. As the principal owner of a customs brokerage house (Airway Shipping), Yip admits he made personal use of funds his clients turned over to him to satisfy their customs obligations to the government. He claims those practices of diverting funds to other businesses and to his own personal use—practices which eventually helped to drive his business into bankruptcy—may have been those of an irresponsible businessman, but did not constitute criminal conduct.

The government responds that under the statute all acts that may deprive the Customs agency of duties are made criminal. Our principal task on this appeal is to determine whether the statute is so all-encompassing. We affirm the mail fraud convictions, but reverse the convictions under the customs counts and remand those counts for a new trial.

Mary Boresz Pike, New York City (Somerstein & Pike, New York City, of counsel), for appellant.

Debra D. Newman, Asst. U.S. Atty., Garden City, N.Y. (Andrew J. Maloney, U.S. Atty., Matthew E. Fishbein, Asst. U.S. Atty., E.D. New York, Brooklyn, N.Y., of counsel), for appellee.

Before CARDAMONE and MINER, Circuit Judges and POLLACK, District Judge.*

CARDAMONE, Circuit Judge:

Matthew Yip appeals from a judgment entered on May 5, 1989 in the United States District Court for the Eastern District of New York (Costantino, J.), convicting him, after a jury trial, of 14 counts of mail fraud in violation of 18 U.S.C. § 1341 (1988), and 59 counts of depriving the United States of lawful duty payments in violation of 18 U.S.C. § 542 (1988). On appeal he contends, *inter alia*, there was insufficient evidence to support the § 1341 mail fraud convictions, and that the importation of goods using non-fraudulent invoices, followed by the failure to pay customs duties

## BACKGROUND

A brief explanation of the services brokers provide and the relationship of appellant to his customers is helpful to an understanding of this appeal. Brokers act as agents for importers in the import/export business. A broker collects money from an importer that he uses to pay charges incurred in the importation of goods into the United States, including ocean freight, brokerage fees, customs duties, and incidental costs. The broker aids the importer in paying duties through the following two-step process. When the goods arrive in the United States and are stopped at the border by the Customs Service, the broker generally files a form 3641 listing the goods being imported. *See* 19 C.F.R. § 142–3(a)(1) (1990). If there is no suspicion of fraud or other irregularity with the paperwork and the importer has posted a bond to cover the cost of the customs duties owed on the goods, they are released to the broker. *See* 19 C.F.R. § 142.4 (1990). The broker then has 10 days to

* Honorable Milton Pollack, Senior United States District Court Judge for the Southern District of New York, sitting by designation.

complete the second step by filing a form 7501, detailing the duty owed on the goods contained in the shipment and enclosing a check to cover the amount owed. *See* 19 C.F.R. § 142.11 (1990).

In this case, Airway followed a slightly modified version of this procedure, that is, the form 3461 was filed pursuant to a special permit for "immediate delivery" provided under 19 C.F.R. § 142.21 "setting forth an adequate description of the merchandise and the quantities, together with the values or approximate values [of the goods]." 19 C.F.R. § 142.22 (1990). This method helps speed release of the goods from customs. Airway then had the standard 10 days to file the form 7501 with a check attached to pay duties on the goods. 19 C.F.R. § 142.23 (1990).

Although importing companies routinely rely on customs brokers to act as their agents, secure safe passage through the maze of customs regulations, and pay the duties owed on their goods in the two-step process just described, the brokers are only the agents of the importers; an importer remains liable to the United States for duties regardless of what payment arrangements it may have made with a broker/agent. *See* 19 C.F.R. § 111.29(b) (1990). Thus, if the broker does not submit the form 7501 and payment within 10 days, then the importer, as principal, is subject to a penalty assessed by Customs. These penalties can include a demand for immediate payment on the bond furnished by the importer, 19 C.F.R. §§ 142.15, 142.27, a refusal by customs to allow future release of the importer's goods without payment at the time of release, 19 C.F.R. § 142.13, and withdrawal of immediate delivery privileges, if any exist. 19 C.F.R. § 142.25(a)(1) (1990).

Customs regulations allow wide latitude in the arrangements brokers may make with their importer clients regarding payment terms. For example, brokers are not required to segregate client funds and earmark them for duties, and importers may simply forward funds to the broker to cover the duty owed with the understanding that the broker will in turn pay the government. Alternatively, an importer may give checks to its broker already made out to the order of U.S. Customs, thereby avoiding any potential problems such as embezzlement.

Customs regulations in force at the relevant times in this case required brokers to place a notice on their invoices of the importer's right to pay U.S. Customs Service directly, 19 C.F.R. § 111.29(b) (1986). The parties agree that Airway fully complied with the above regulations. The difficult question before us is whether Yip committed a criminal act against the United States when he obtained a client's funds by promising to pay its duties to Customs, and instead kept the money for his own use.

## FACTS

With that background of the relationship between a broker and its client and the governing regulations, we describe the circumstances that led to this appeal. Samsung Electronics America, Inc. and Samsung International, Inc., two affiliated corporations (collectively Samsung), import electronic goods for sale in the United States. In 1985 Samsung engaged Airway to act as its customs broker for imports into New York. Beginning in August 1985 it retained Airway to take charge of imports into Los Angeles as well. Airway hired a local California customs brokerage house, RS International, for assistance in handling Samsung's Los Angeles operations. Samsung agreed to pay Airway which, in turn, undertook to forward money to RS International. The latter company agreed to pay customs duties on Samsung's behalf. Unfortunately, matters did not go as planned.

In May 1986 RS International received Airway's duty payments late. Upon inquiry, it was told by Airway that Samsung had been slow in paying Airway and that this accounted for the delay. Airway's late payments to RS International continued, and further inquiries were met by more untruthful excuses. By July 1986, when Samsung heard of the problem, it told RS International to look to Airway because Samsung had made all its duty payments

promptly. Samsung was not then aware that over $1 million of its customs duties had not been paid for its California imports.

On August 8, 1986 RS International formally terminated the handling of Samsung's account with Airway. When Airway went out of business—forced by its creditors into involuntary bankruptcy in early November 1986—the two affiliated Samsung companies had an obligation to pay the government $2.6 million in duties Airway had never paid to Customs.

At the time Airway went bankrupt it had filed all the necessary 3461 forms for release of Samsung's imported merchandise, but had not filed all the 7501 forms with the required duty checks. The $2.6 million in unpaid duties was paid by Samsung. In settling its account with the two Samsung entities, the government agreed to waive the penalties for late payment of duties.

### THE TRIAL

The government selected 59 invoices—accounting for $1.8 million out of the $2.6 million in duties—that formed the basis for the 59 counts charged against Yip under 18 U.S.C. § 542. At trial the evidence showed that from May to October 1986, while Yip accepted funds from Samsung supposedly for payment of its customs duties, he was using the funds to make mortgage payments on his Long Island home and to purchase a $25,000 Mercedes Benz automobile. Yip also frequently transferred money received from Samsung to support his other businesses, and in September, 1986, Yip used some of the money to purchase a certificate of deposit in his own name.

Yip's business partner in Airway, Charles Hartill, who was a licensed customs broker himself, testified that Yip took advantage of the "float" provided by the constant influx of Samsung's funds, deferring payment of customs duties, and using the money for his own purposes. Hartill also testified that in mid-October 1986—as Airway was self-destructing financially—Yip asked him to start a new company under a new name in which Yip would be a silent partner. Under this scheme, Hartill allegedly would take over the accounts held by Airway—without the customers being aware that Yip was still involved in their business. According to this witness, Yip offered to give him a $50,000 loan if he would cooperate, but Hartill declined the offer and left Airway's employ at the end of October. On cross-examination, Hartill's credibility was attacked and he refused, on Fifth Amendment grounds, to answer six questions regarding an alleged kick-back/extortion scheme he was involved in while he was an Airway employee.

On November 15, 1986—just prior to the bankruptcy trustee's assuming control of Airway's assets—Yip ordered an accountant to alter the company's books. The alterations reclassified several loans Airway had made to Yip as "compensation," and greatly reduced the amounts shown as accounts receivable owed to Airway by Yip's other corporations. In some cases, the alterations showed falsely that these corporations were creditors of Airway.

The prosecution's case against Yip was based on mail fraud under § 1341 and customs duties violations under § 542. The jury convicted him on all counts under both statutes. We undertake an analysis of appellant's conviction under both § 1341 and § 542.

### DISCUSSION

I  18 U.S.C. § 1341—The Mail Fraud Counts

    A.  *Sufficiency of the Evidence*

■ In asserting the evidence adduced was legally insufficient to support his conviction for mail fraud, Yip bears a heavy burden. *See United States v. Gaviria*, 805 F.2d 1108, 1116 (2d Cir.1986), *cert. denied*, 481 U.S. 1031, 107 S.Ct. 1960, 95 L.Ed.2d 531 (1987). A conviction must be upheld if "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original).

To sustain a conviction under § 1341 the government must prove "that the defendant (1) participated in a scheme to defraud; and (2) knowingly used the mails to further the scheme." *United States v. Gelb,* 700 F.2d 875, 879 (2d Cir.), *cert. denied,* 464 U.S. 853, 104 S.Ct. 167, 78 L.Ed.2d 152 (1983). Section 1341's scope is broad. It reaches "any scheme to deprive another of money or property by means of false or fraudulent pretenses, representations, or promises," *Carpenter v. United States,* 484 U.S. 19, 27, 108 S.Ct. 316, 321, 98 L.Ed.2d 275 (1987), including "the act of embezzlement, which is 'the fraudulent appropriation to one's own use of the money or goods entrusted to one's care by another.' " *Id.* (quoting *Grin v. Shine,* 187 U.S. 181, 189, 23 S.Ct. 98, 101, 47 L.Ed. 130 (1902)).

Applying these principles, the evidence was sufficient to show Yip violated § 1341. A rational trier of fact could have concluded that Yip controlled Airway, and sought to take the Samsung affiliates' money in 1986 with the intention of keeping it for his own personal use or to pay the expenses of his other corporations rather than to pay customs duties. A rational trier of fact could also find Yip tricked Samsung into giving Airway the money for duties instead of having Samsung pay United States Customs directly. There was testimony that Airway's sales representative lied to Samsung to secure this arrangement by stating that this would speed release of the goods. A rational trier of fact could conclude this falsehood was made at Yip's request.

Moreover, it could be found Yip never intended to pay duties owed by Samsung when he accepted the money paid to him for that purpose. Charles Hartill testified Yip expressly sought to gain access to these funds to use the "float" for his own purposes—business and personal. Yip argues that this proof, along with the other evidence adduced at trial, shows only that he intended to make payments late, not that he never intended to pay. Were this the only evidence supporting the government's theory, we might agree; but it was not. Yip's actions in using the funds to bankroll his other corporations, make personal loans to himself, pay off his mortgage, and take out a certificate of deposit in his own name also support the government's theory of the case. A rational trier of fact was entitled to believe that, after a certain point, these activities would bankrupt Airway—and that Yip knew this—making his continued acceptance of Samsung's funds fraudulent.

A rational trier of fact was also entitled to consider Yip's suspicious actions after he had accepted the money as corroborating proof of fraudulent intent. When Airway was struggling financially in October 1986, for instance, Yip attempted to get Hartill to start a new customs brokerage business in which he would be a silent partner—an offer which suggests Yip was aware he had committed acts tending to make him appear untrustworthy to clients and was acting to cover up those acts. Further, at the eleventh hour, as control of Airway was about to pass into the hands of a bankruptcy trustee, Yip had an accountant "reclassify" loans made to himself from Airway's bank account as "compensation," and alter the books to disguise the earlier transactions which funnelled money out of Airway to Yip's other corporations. These facts corroborated the direct proof showing Yip intended to defraud Samsung during the time he accepted its funds. Consequently, the evidence was sufficient to support Yip's conviction under § 1341.

### B. *Trial Court's Instructions on Specific Intent and Ruling on Sixth Amendment Claim*

■ Yip further contends the district court failed to instruct the jury adequately on the issue of "specific intent to defraud." The record is otherwise. Not only did the court refer several times in its charge to the requirement that Yip must be shown to have specific intent to defraud, but it also stated that "an essential element of the crime ... is intent to defraud" which it explained, "means to act knowingly and with the specific intent to deceive, for the purpose of causing some financial loss to another," and instructed that "even false representations or statements or omissions

of material facts do not amount to fraud unless done with fraudulent intent." These instructions accurately and properly instructed the jury on this issue.

■ In addition, since the language Yip now argues the court should not have included was included in his own proposed instructions, any objection to this instruction was waived. *See United States v. Sun Myung Moon*, 718 F.2d 1210, 1226 (2d Cir.1983), *cert. denied*, 466 U.S. 971, 104 S.Ct. 2344, 80 L.Ed.2d 818 (1984). Appellant's challenge to the trial court's instruction on intent to defraud is meritless.

■ Moreover, there is no merit to appellant's allegation that his Sixth Amendment right to confront the witnesses against him was abridged when the district court refused to strike Hartill's testimony. This witness refused on cross-examination to answer questions—claiming his Fifth Amendment privilege—regarding a check cashing and kickback scheme he was allegedly involved in while at Airway. The scheme was not the subject of direct examination, and it was therefore a collateral matter bearing solely on Hartill's credibility. *See United States v. Cardillo*, 316 F.2d 606, 611 (2d Cir.), *cert. denied*, 375 U.S. 822, 84 S.Ct. 60, 11 L.Ed.2d 55 (1963). Defense counsel was permitted extensive cross-examination of Hartill on this subject. Hence, we find no abuse of the district court's discretion in its refusal to strike the witness' testimony.

## II 18 U.S.C. § 542—Customs Violations Counts

More troublesome is appellant's contention that § 542 requires proof of specific intent to defraud the government. A fair reading of the text of the statute reveals it punishes two distinct offenses. The first offense proscribes the introduction of imported merchandise through means of any "false or fraudulent practice" regardless of whether the United States is deprived of duties. That offense clearly requires proof of specific fraudulent conduct. The second offense—under which Yip was charged—is directed at the loss of duties and makes "any willful act or omission" a crime, without explicitly requiring that the act or omission be done with intent to defraud the United States. The government argues Yip was properly convicted under § 542 because there was sufficient evidence to show he willfully omitted to pay customs duties owed by Samsung.

■ Appellant responds that even the second offense under § 542 requires proof of both fraud and specific intent to defraud the United States. Although we do not agree with the appellant's interpretation of the statute, we think Yip is correct that the act or omission section requires that the government show the defendant willfully undertook an act or omission that he knew or should have known would result in depriving the government of customs duties. We set forth our reasons for coming to this conclusion in the discussion that follows.

### A. The "Plain Meaning" of the Statute

We must, of course, first turn to the statutory language, *see Perrin v. United States*, 444 U.S. 37, 42, 100 S.Ct. 311, 314, 62 L.Ed.2d 199 (1979). Section 542 provides in relevant part:

Whoever enters or introduces, or attempts to enter or introduce, into the commerce of the United States any imported merchandise by means of any fraudulent or false invoice, declaration, affidavit, letter, paper, or by means of any false statement, written or verbal, or by means of any false or fraudulent practice or appliance, or makes any false statement in any declaration without reasonable cause to believe the truth of such statement, or procures the making of any such false statement as to any matter material thereto without reasonable cause to believe the truth of such statement, whether or not the United States shall or may be deprived of any lawful duties; or

Whoever is guilty of any willful act or omission whereby the United States shall or may be deprived of lawful duties accruing upon merchandise embraced or referred to in such invoice, declaration,

affidavit, letter, paper, or statement, or affected by such act or omission—

Shall be fined for each offense not more than $5,000 or imprisoned not more than two years, or both....

■ We agree with the government's construction of the first offense under § 542—importation by use of false statements or practices. Anyone seeking to import goods who, in the course of that importation, makes a false statement (written or oral), is guilty of a criminal act.

The second paragraph of § 542 is more difficult to parse. It has two prongs that criminalize two separate kinds of acts and omissions. The first prong refers back to the false statement provision of the first offense portion of the statute when it states: "Whoever is guilty of any willful act ... whereby the United States ... may be deprived of any lawful duties accruing upon merchandise embraced or referred to in such invoice, declaration...." The use of the word "such" clearly refers back to the "invoice," etc. listed in the first paragraph. The only invoice or paper specified in the first paragraph of § 542 are false ones. Hence, this first part of the second paragraph makes criminal those acts and omissions that deprive the United States of duties on the merchandise specifically related to the false statements.

■ This first part of the second paragraph obviously is not intended to criminalize acts and omissions that are themselves false statements since these are covered by the text of § 542's first paragraph. We think this a sound conclusion because a construction ascribing to two separate statutory provisions the same meaning ·and scope is disfavored. *Cf. Russello v. United States*, 464 U.S. 16, 23, 104 S.Ct. 296, 300, 78 L.Ed.2d 17 (1983) (court will refrain from concluding that differing language in two subsections has the same meaning due to some mistake in draftsmanship). Rather, the language in the second paragraph of § 542 must proscribe conduct *not* covered by the first offense. Examples of this sort of conduct would be helping to package and ship the merchandise referred to in the false invoice, carting away the goods

covered in the false invoice, or knowing that the invoice being relied upon by Customs contains falsehoods but failing to alert the agency to those falsehoods, thereby depriving the government, or attempting to deprive it, of duties. The last example would apply only if someone other than the defendant made the false statement first, and the defendant simply failed to correct it.

This view of the statute does—contrary to the government's assertion—make sense. The second paragraph of § 542 proscribes conduct distinct and separate from that covered by the first paragraph. Further, it prohibits conduct Congress would aim to discourage in order to prevent illegal importation of goods and to protect the collection of customs revenues. In effect, the second paragraph could reasonably be read to "mop up" the false statement provision by making sure that those who seek to defraud the government by willfully taking advantage of the false statements of others are penalized just as are those who made them in the first place.

The second paragraph has a second prong that does not refer to the earlier false statement provision. This "act or omission" prong is the particular part the government claims Yip transgressed. Defendant argues that this prong may not be read to proscribe an offense completely separate from the rest of the statute. He reasons that because the term "such invoice" in the second paragraph refers to the false invoices mentioned in the first paragraph, so too the term "such act or omission" must relate back to the first paragraph, so that the government, he concludes, must prove the act or omission was deceptive in the same way that it must prove the invoices were false. We do not agree.

On the face of the statute, "such invoice" must refer to the false invoices mentioned in the first paragraph. But "such act or omission" can refer to nothing other than the beginning of the second paragraph, for that is the only other place the phrase is to be found. The beginning phrase "Whoever is guilty of any willful act or omission" is

the first mention of "act or omission" in the statute. It begins a separate paragraph, following an "or," and it forms a complete and logical prohibition standing on its own without reference to the first paragraph. We conclude that the second paragraph's act or omission offense is entirely separate from the statute's first paragraph. The second paragraph reads:

> Whoever is guilty of any willful act or omission whereby the United States shall or may be deprived of any lawful duties accruing upon merchandise . . . affected by such act or omission—
>
> Shall be fined for each offense not more than $5,000 or imprisoned not more than two years, or both. . . .

This paragraph would make criminal the omission to file any forms on goods brought into the United States and any acts undertaken in bringing such undeclared goods into the United States. These acts and omissions are not false statements and so are not covered by the first paragraph of § 542, nor are they acts and omissions through which an individual seeks to benefit from the false statements of another, distinguishing these acts and omissions from those covered by the first part of the second paragraph of the statute. Nevertheless, it makes sense that Congress would want to make criminal not just false statements made to secure importation of goods and intentional reliance thereon, but also willful attempts to avoid making statements and paying duties altogether—an equally invidious form of deception, i.e., smuggling, that deprives the government of lawful revenues.

There is another broader set of acts or omissions this paragraph arguably proscribes. Those are any willful acts or omissions which are not attempts to smuggle specific merchandise through customs, but which nevertheless may act to deprive the United States of lawful duties; in other words, willful acts or omissions taken at any time during the importation process that may affect negatively the ability of the United States to collect its lawful duties. The relevance of this proscription is plain.

In this case, there is no claim Yip smuggled goods into the country, and the government was not actually deprived of its lawful duties because Samsung, which was primarily liable for the duties, paid them. Therefore, Yip's conviction must rest on the theory that, because of his willful acts or omissions, the government might have been deprived of duties had Samsung not been solvent. But it is unclear from a reading of the language of the statute how close the causal connection must be between the willful act or omission and the resulting increased probability that the United States will be deprived of lawful duties. On its face, the statute does not contain any limiting principle that prevents it from making criminal any and all acts— no matter how far removed—that might deprive the government of lawful duties. Because interpretations of criminal statutes which would "criminalize a broad range of apparently innocent conduct" are disfavored, *Liparota v. United States*, 471 U.S. 419, 426–27, 105 S.Ct. 2084, 2088–89, 85 L.Ed.2d 434 (1985), it is our task to ascertain whether Congress intended the statute to be so all-encompassing. *See Bifulco v. United States*, 447 U.S. 381, 387, 100 S.Ct. 2247, 2252, 65 L.Ed.2d 205 (1980) (where scope of criminal statute is uncertain, court will examine language, structure, legislative history, and motivating policies of the act to ascertain congressional intent).

### B. *Legislative History of § 542*

To answer this question, we turn to the statute's legislative history, *see Bradley v. Austin*, 841 F.2d 1288, 1293 (6th Cir.1988), to see if it sheds light on whether the act or omission section incorporates any such limiting principle. The statute's roots can be traced to the Act of March 2, 1799, ch. 22, 1 Stat. 627, 677 which stated in part

> That if any goods, wares or merchandise, of which entry shall have been made in the office of a collector, shall not be invoiced according to the actual cost thereof, at the place of exportation, with design to evade the duties thereupon, or any part thereof, all such goods, wares

or merchandise, or the value thereof, to be recovered of the person making entry, shall be forfeited....

*Id.* at § 66.

It can be seen that the present criminal statute was, in its origins, and for 75 years thereafter, a civil forfeiture penalty for customs violations. It was modified twice, in 1830, Act of May 28, 1830, 4 Stat. 409 (1830), and in 1832, Act of July 14, 1832, 4 Stat. 583 (1832), before a version quite similar to the current § 542—including for the first time a criminal penalty—was adopted in 1874. The 1874 Act provided

> That any owner, importer, consignee, agent, or other person who shall, with intent to defraud the revenue, make or attempt to make, any entry of imported merchandise, by means of any fraudulent or false invoice, affidavit, letter, or paper, or by means of any false statement, written or verbal, or who shall be guilty of any willful act or omission by means whereof the United States shall be deprived of the lawful duties, or any portion thereof, accruing upon the merchandise, or any portion thereof, embraced or referred to in such invoice, affidavit, letter, paper, or statement, or affected by such act or omission, shall, for each offense, be fined in any sum not exceeding five thousand dollars nor less than fifty dollars, or be imprisoned for any time not exceeding two years, or both; and in addition to such fine, such merchandise shall be forfeited; which forfeiture shall only apply to the whole of the merchandise in the case or package containing the particular article or articles of merchandise to which such fraud or alleged fraud relates....

Act of June 22, 1874, ch. 193, § 12, 18 Stat. 186 (1874).

In 1890, Act of June 10, 1890, ch. 407, §§ 6, 9, 26 Stat. 134, 135 (1890), and in 1909, Act of August 5, 1909, ch. 6, § 28, 36 Stat. 95–97 (1909), the statute was again amended without any significant change to the willful act provision. The civil and criminal penalty provisions were separated for the first time under the Act of Sept. 21, 1922, ch. 356, §§ 591 and 592, 42 Stat.

981–82 (1922), but the willful act provision remained unchanged, as it did in the 1930 enactment, *see* Act of June 17, 1930, ch. 497, § 591, 46 Stat. 750 (1930), when changes were made to the false statement portion. In 1935, a single phrase was inserted at the end of the False Statement provision ending in a semicolon, *see* Act of August 5, 1935, ch. 438, § 304(a), 49 Stat. 527 (1935), separating for the first time the provisions concerning false statements and willful acts.

The statute was amended in 1948 to its present format. *See* Act of June 25, 1948, ch. 645, § 542, 62 Stat. 683, 715 (1948). In this current version Congress deleted the twice used phrase "or any portion thereof" from the willful act or omission provision, without explaining why these words—first added in the 1874 version—were eliminated. *See* S.Rep. No. 1620, 80th Cong., 2d Sess. 1 (1948); H.R.Rep. No. 304, 80th Cong., 2d Sess., Appendix, at A45 (1948). We need not tarry long on this point because the words taken out were surplusage, included with the items they qualified in earlier versions of the statute, lawful duties and merchandise. We think a simple streamlining was all that was intended, and no contrary indication is found in the legislative materials. This legislative history, while sparse, does demonstrate that the statute originated as a civil forfeiture, rather than a criminal, statute. Thus, its broad language, which has remained basically unchanged over the years, cannot be said to have stemmed from a Congressional aim to make an all-encompassing category of acts criminal. Rather, Congress desired to protect the government's economic interest by ensuring the collection of appropriate customs duties.

### C. *Case Law under § 542*

Next, we examine the case law to see what light it sheds on the question posed. Research has not unearthed a single case where a person accused of violating the willful act or omission paragraph of § 542 or its predecessors has been successfully prosecuted and convicted upon the government's proposed, unlimited interpretation of that paragraph. Almost all cases

brought under § 542, even those that mention or discuss the act or omission section, involve an intent to deceive the government as to the proper amount of duties owed on specific merchandise. *See, e.g., United States v. Borello*, 766 F.2d 46 (2d Cir.1985); *United States v. Cutajar*, 60 F. 744 (C.C.S.D.N.Y.1894).

There is support in these cases for interpreting the statute in a manner requiring proof of at least a close nexus between an act or omission and the deprivation of government of duties, for several earlier cases employ proximate causation language. In *United States v. Boyd*, 24 F. 692 (C.C.S.D.N.Y.1885) (Brown, J.), *rev'd on other grounds*, 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 (1886), defendants' convictions were upheld upon proof showing they had secured free passage of goods through customs by first obtaining, through fraudulent representations, a letter from the Treasury Department stating the goods were to be used in the construction of a United States Post Office. The court held that obtaining the letter "cannot be considered as a remote or indirect cause only, but as the direct procuring cause of the free entry." *Id.* at 696. While it appears that the court based its holding more on the fact that the invoices were false than on the theory that the letter from the Treasury constituted an "act or omission," the use of the proximate cause language is noteworthy.

In *Cutajar*, 60 F. 744, in the course of discussing whether the false invoice provision of the statute also required proof that the scheme did deprive or could have deprived the government of duties, the court noted that the scheme of asserting a false weight on the invoice, combined with a false return filed by the government agent doing the weighing "doubtless facilitates the entry of goods upon payment of less than the legal amount of duties, and so may be a means whereby the United States shall be deprived of the lawful duty on the merchandise." *Id.* at 745. Although the court ultimately concluded a false invoice alone was sufficient for a conviction under the first paragraph of § 542, it noted that the connection between the act of coordi-

nating a false invoice and a false weight would directly, rather than indirectly, cause the government to be deprived of duties.

In *United States v. Seventy Five Bales of Tobacco*, 147 F. 127 (2d Cir.1906), we turned down the government's effort to confiscate tobacco innocently, though improperly, labeled under the 1890 version of the statute, stating: "Proof which is sufficient to uphold a forfeiture of the importers' property is also sufficient to justify a conviction, fine and imprisonment. Such a statute must be strictly construed. Manifestly it was not intended to apply to mistakes or errors in judgment but to acts of commission and omission, which plainly indicate a willful and culpable intent to defraud the government of its lawful revenues." *Id.* at 130.

In *United States v. Rosenthal*, 126 F. 766 (C.C.S.D.N.Y.1903), *aff'd sub nom, Browne v. United States*, 145 F. 1 (2d Cir.1905), *cert. denied*, 200 U.S. 618, 26 S.Ct. 755, 50 L.Ed. 623 (1906), an indictment against an importer of goods under the 1890 version of the statute was sustained. The court distinguished the second of the two offenses proscribed by the statute from the first as follows:

Then Congress adds the further provision that, if any person shall be guilty of a willful act or omission, he shall be punished, provided such act or omission results in the deprivation of the United States of lawful duties. A willful act or omission might not in itself be fraudulent, and it might in itself, save as a matter of infraction of discipline, be entirely harmless, and it might occur in such a great variety of ways that Congress was unwilling to attach the punishment to it, unless it was the proximate cause of the government losing revenue.

*Id.* at 776–77. In that case, the importer had filed false invoices, so the court did not explore the question of how proximate the defendant's actions needed to be to the government's loss of revenue in order to be closely considered criminal under the willful act provision, and the paragraph quoted is dicta. Nevertheless, given the paucity of case law considering this statute, the fact

that the court read the paragraph as incorporating a "proximate cause" requirement is persuasive.

In *United States v. 218½ Carats Loose Emeralds*, 153 F. 643 (S.D.N.Y.1907), *aff'd*, 154 F. 839 (2d Cir.1907), Manuel Suarez arrived in New York, and stated to a customs official that he did not have any precious stones or jewelry on his person. A subsequent search turned up a bag of emeralds in one of his pockets, and he was charged under the 1890 Act. Stating that the statute's two parts had separate applications, and that the first applied to goods upon which the importer filed papers, which contained falsehoods, the judge said Suarez could not be said to have violated the first part because he did not file false statements regarding goods he admitted he was importing. The second part—the willful act or omission portion—did apply, the judge said, because Suarez concealed the presence of the emeralds when he was asked explicitly by the customs inspector if he had any precious stones. *Id.* at 646.

The government believes *Loose Emeralds* supports a broad construction of the second paragraph under § 542. We are unable to agree for two reasons. First, as we read the statute, Suarez could have been convicted under the first or false statement paragraph of the statute since he explicitly stated—in response to a direct question on the subject—that he did not have any precious stones on his person when in fact he did. Second, the court's interpretation accords with a narrow reading of the willful act provision. That is, the statute applies in a case where the accused seeking to avoid customs makes no statement regarding goods he is importing, where such willful act or omission deprives or may deprive the government of revenues, and where the act is so directly connected to the deprivation of the duties that the defendant knew what result would follow from his actions. In essence, the accused is engaged in smuggling. The smuggling scenario is a distant stretch from the government's proposition that any willful act or omission by a defendant which in any way deprives the United States of duties is a crime under § 542.

In sum, the above opinions repeat a refrain similar to the theme in *United States v. Ninety–Nine Diamonds*, 139 F. 961 (8th Cir.1905), *cert. denied*, 201 U.S. 645, 26 S.Ct. 760, 50 L.Ed. 903 (1906), where the court held that the statute is "highly penal" and must be strictly construed. *Id.* at 967, *quoting United States v. 84 Boxes of Sugar*, 7 Pet. 453, 461, 8 L.Ed. 745, 748, and none of the cases involve as remote a connection as the one before us. Thus, the case law of this Circuit supports a narrow reading of the statute.

### D. *The Scienter Requirement*

Logic also convinces us that this statute does not have as broad a reach as the government believes. It urges that § 542 criminalizes all willful acts or omissions that shall or may deprive the United States of lawful duties, without proof of scienter that such acts or omissions would so deprive it. Under the government's interpretation, a conviction may be upheld any time a broker commits a fraud on a client—by taking money given to him with the understanding it will be paid to the government for customs duties and even temporarily converting it to his own use—because such action constitutes a "willful act or omission" for purposes of § 542. Under this inclusive construction every fraud on a client—regardless of when it is perpetrated or whether it directly jeopardizes the payment of customs duties—constitutes a crime, a violation of § 542, providing the prosecution can establish even a tenuous link connecting the fraud to the deprivation of duties. This is true, the government insists, even when there was never any risk—because of the financial security provided by the importer in bond or other form—that the United States would actually be deprived of any duties.

Taken to its logical conclusion, the government's interpretation is all encompassing. After a customs broker submits the proper papers to have the goods released from Customs, *any* "willful act or omission" on its part which does or may deprive the government of lawful duties arguably would constitute a criminal act

under the second paragraph of § 542. For instance, Yip's decisions to remove funds from Airway's bank account could be considered criminal since these transactions made payment of duties more difficult. Airway's bankruptcy—assuming Samsung's inability to pay—could then have deprived the government of revenue.

Reading this penal statute narrowly—as we believe we must—makes plain that the "willfulness" language used is crucial to its interpretation. The act in question must be "willful"—that is, it must be done with knowledge of the results that are of concern to the government. Were we to read "willful" to denote any act done voluntarily by a competent person, as the government apparently would have us, such construction would exclude only accidents. This view would leave open the possibility that indirect acts performed by an ordinary citizen going about his business could suddenly make him a felon.

Given the civil origin of the statute and the case law's repeated emphasis on the need to construe this penal statute narrowly, we believe Congress must have planned that, in order to constitute criminal conduct, the willfulness of a person's acts must not only extend to their voluntariness and the person's competency, but also to the defendant's ability to foresee the act's effect on the government's loss of customs duties. This interpretation is in accord with our use of the language of proximate cause, for it is only those acts that are the proximate cause of the deprivation of lawful duties that a defendant could be expected to have known would result in such deprivation.

In sum, we hold that the government must prove that the link between the act and the deprivation was so direct that a defendant knew or should have known his actions would deprive the government of lawful duties. And, since here the government never attempted to prove Yip's scienter, and the trial court did not instruct the jury on this issue, the conviction cannot stand on the § 542 counts.

## CONCLUSION

The convictions for 14 counts of mail fraud charged under 18 U.S.C. § 1341 are affirmed. The 59 counts charging appellant with depriving the United States of lawful duty payments under 18 U.S.C. § 542 are reversed and the matter is remanded as to those counts to the district court for whatever further proceedings it deems advisable.

Affirmed, in part, reversed, in part, and remanded for further proceedings.

MINER, Circuit Judge, dissenting in part:

Because I would affirm the appellant's convictions on the counts charging him with depriving the United States of lawful duty payments under 18 U.S.C. § 542, as well as on the counts charging him with mail fraud in violation of 18 U.S.C. § 1341, I respectfully dissent in part.

As recognized by my brethren, Maj. op. at 147, two distinct offenses are defined by the provisions of 18 U.S.C. § 542: the entry of imported merchandise by means of a false statement, "whether or not the United States shall or may be deprived of any lawful duties"; and any willful act or omission "whereby the United States shall or may be deprived of lawful duties." We deal here with the second offense, for which appellant was convicted upon uncontroverted evidence that he converted to his personal use substantial sums of money furnished to him as a customs broker by Samsung for the payment of custom duties on electronic equipment imported into this country. My brethren "hold that the government must prove that the link between the act and the deprivation was so direct that defendant knew or should have known his actions would deprive the government of lawful duties." *Id.* at 153. The conviction is reversed and a new trial ordered because "the government never attempted to prove Yip's scienter, and the trial court did not instruct the jury on this issue." *Id.* I am unable to agree with the holding or its consequences.

The district court instructed the jury using the precise statutory language defining the second offense set out in § 542. The

court further instructed that "the government must prove beyond a reasonable doubt ... that the defendant acted knowingly and willfully." The very next instruction included the standard definitions of "knowingly" and "willfully." I think that these instructions are all that appellant was entitled to on the issue of scienter and that the evidence fully justified his conviction. I do not know what deficiencies my brethren refer to when they describe the absence of a "link" between act and deprivation so direct as to demonstrate that defendant knew or should have known that he would be depriving the government of customs duties. What could be more direct than the theft of monies known to be due and payable to the United States?

Of course, it could be said that appellant could not *know* that the government would be deprived of its duties if he believed that Samsung eventually would pay. But that type of knowledge is not what the statute requires. What is required is a knowing *act* which "shall or may" deprive the government of monies due it. The jury certainly was free to find that appellant's act of stealing was knowing as well as willful. As far as the deprivation, the act of stealing itself demonstrated that the customs duties stolen might never find their way into the government's coffers. It seems ludicrous for appellant to be exonerated from liability merely because someone else would make good on his obligation. Samsung eventually did make good, despite having given appellant the same amount previously for the same purpose. The government did in fact lose money here, however, because it agreed to waive penalties and interest for late payment.

In any event, I think that it reads too much into the statute to impose a specific scienter requirement with regard to the government's loss of money, as the majority holds. The statute requires only that the government shall or may be deprived. Whether the government is or is not ultimately deprived really is of no moment. The historical background discussed in the majority opinion relates to statutes worded much differently from the one with which we are concerned. Likewise, the cases cit-

ed in the majority opinion provide no direct support for a requirement of knowledge of actual deprivation. There simply is no basis to say, in view of the plain language of the statute, that "Congress must have planned that ... the willfulness of a person's acts must not only extend to their voluntariness and the person's competency, but also to the defendant's ability to foresee the act's effect on the government's loss of customs duties." *Id.* at 153. If Congress wanted to include the element of forseeability in section 542, it certainly knew how to do so.

Finally, I do not agree that the government's interpretation of the statute is so "all encompassing" as to sweep within it the "indirect acts" of "an ordinary citizen going about his business." Only those who willfully act or fail to act in such a way as to cause the government to lose, or to stand in jeopardy of losing, customs duties, are covered. Not every fraud perpetrated by a customs broker upon a customer will give rise to a successful prosecution, as my brethren fear. Only those frauds that jeopardize the collection of customs duties, whether the duties ultimately are lost or not, were the concern of Congress in enacting this statute. The failure of the majority to recognize the fact that Congress has exercised its power to criminalize this sort of conduct compels my dissent.