UNITED STATES of America, Plaintiff,

v.

ZHANG Jian Zhong, Li Ping, Wu Yimin, Sunlight International, Inc., China Jiangsu Knitwear & Home Textiles Import & Export (Group) Corporation, C & H West Merchandising, Inc. and Robert Hsu, Defendants.

No. 92 Cr. 373 (KC).

United States District Court, S.D. New York.

Sept. 27, 1993.

ORDER

CONBOY, District Judge:

The defendants in this case are all charged with conspiring to defraud the U.S. Customs

Service ("Customs") in connection with various imports of clothing from China during 1989 through 1991. In addition, Defendants Li,[1] Sunlight, Jiangsu Knitwear, C & H West, and Hsu are charged with importing goods while underpaying import duties, depriving the United States of customs duties by means of false statements, and smuggling. Defendants Li, Sunlight, and Jiangsu Knitwear are further charged with conspiring to defraud the Internal Revenue Service ("IRS"). All of these charges relate to violations of various sections of Title 18 of the United States Code.

Defendants Li, Wu, and Sunlight (the "Sunlight defendants") have filed pretrial motions in which Defendants Hsu and C & H West (the "C & H West defendants") join. (As Zhang and Jiangsu Knitwear have not yet appeared in this matter, this order will refer to the other five defendants as simply "the defendants.") The defendants have moved to suppress the evidence discovered during the search of Sunlight's offices on the grounds that the search warrant depended for its showing of probable cause on false statements made knowingly and intentionally or with reckless disregard for the truth, and that the search warrant was unconstitutionally general.

The defendants have also challenged the indictment as impermissibly multiplicitous, arguing that it improperly charges a single course of conduct in multiple counts. The defendants claim this multiplicity is achieved by arbitrarily breaking down the counts of the indictment into calendar years, and by charging single acts as violations of multiple statutory provisions. In addition, the defendants have moved for a severance of the count charging a conspiracy to defraud the IRS.

Separately, Defendant Wu has moved for a severance of the charges against him on the ground of prejudicial joinder. Finally, the Sunlight defendants have requested a bill of particulars, and made a number of discovery-related motions.

1. In China, the first name is the surname.

## I. SUPPRESSION OF EVIDENCE DISCOVERED DURING SEARCH OF SUNLIGHT'S OFFICES

### A. Standing

■ Before reaching the claim by the defendants that the search warrant depended on false statements, we must address the Government's contention that the defendants lack standing to challenge the search warrant. In order to challenge a search or seizure on Fourth Amendment grounds, a defendant must establish a reasonable expectation of privacy with respect to the area searched. *E.g., Katz v. United States,* 389 U.S. 347, 361, 88 S.Ct. 507, 516, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring).

■ It is obvious at the outset that the C & H West defendants have no standing to challenge the search of Sunlight's offices, as they have not even attempted to make a showing of a reasonable expectation of privacy. With respect to Sunlight's standing, corporations have standing to challenge searches of their corporate offices and seizure of corporate records from their corporate offices. *See G.M. Leasing Corp. v. United States,* 429 U.S. 338, 352–55, 97 S.Ct. 619, 628–30, 50 L.Ed.2d 530 (1977). The Government suggests that two facts—that Sunlight's offices were on a floor with other offices, and that its offices and file cabinets were unlocked when the Customs agents entered—diminish Sunlight's expectation of privacy to a degree that deprives Sunlight of standing to challenge the search. This contention is without merit. Through the affidavits of Defendants Li and Wu, Sunlight has demonstrated a reasonable expectation of privacy in its offices; that there may have been a failure to lock the door on the occasion the Customs agents entered does not diminish this expectation, and certainly does not transform the offices into a "common area" within the meaning of the cases cited by the Government. *E.g., United States v. DeWeese,* 632 F.2d 1267, 1269–70 (5th Cir. 1980) (captain of a large shrimping vessel has no legitimate expectation of privacy in ship's ice hold), *cert. denied,* 454 U.S. 878, 102 S.Ct. 358, 70 L.Ed.2d 188 (1981); *United States v. John Bernard Indus., Inc.,* 589 F.2d 1353, 1362 (8th Cir.1979) (employee who was most frequent user of desk to which other employees had ready access did not have legitimate expectation of privacy in contents of *employer's* business records stored in desk).

■ The Government further argues that Customs' limited authority to examine Sunlight's business records also lessens Sunlight's expectations of privacy, as Sunlight is part of a "closely regulated" industry. *New York v. Burger,* 482 U.S. 691, 700–01, 107 S.Ct. 2636, 2642–43, 96 L.Ed.2d 601 (1987). However, in order for industry regulation to diminish expectations of privacy to a point where warrantless searches are permitted, the regulation must provide notice to owners of firms in the industry that their " 'property will be subject to periodic inspections undertaken for specific purposes.' " *Id.* at 703, 107 S.Ct. at 2644 (quoting *Donovan v. Dewey,* 452 U.S. 594, 600, 101 S.Ct. 2534, 2538, 69 L.Ed.2d 262 (1981)).[2] The statute granting examination powers to Customs provides no notice of unannounced searches such as the search of Sunlight's offices, as it requires Customs to provide reasonable notice before conducting any examination. *See* 19 U.S.C. § 1509(a)(1) (1988). Further, Customs' examination power is not limited to one industry; rather, Customs is broadly empowered to examine "any" document relevant to:

> any investigation or inquiry conducted for the purpose of ascertaining the correctness of any entry, for determining the liability of *any* person for duty and taxes due or duties and taxes which may be due the United States, for determining liability

---

2. The doctrine permitting warrantless searches of closely regulated industries applies only where the regulatory scheme performs the "basic functions" of a warrant. *Burger,* 482 U.S. at 703, 107 S.Ct. at 2644. This requirement highlights the importance of conducting warrantless searches pursuant to regulatory authority, despite any diminished expectations of privacy due to the mere existence of the regulatory scheme. Accordingly, in both cases upholding warrantless searches cited by the Government, the search was conducted pursuant to regulatory authority. *See id.* at 695, 107 S.Ct. at 2640; *United States v. Chuang,* 897 F.2d 646, 648 (2d Cir.), *cert. denied,* 498 U.S. 824, 111 S.Ct. 77, 112 L.Ed.2d 50 (1990). It is significant that Customs agents did not search Sunlight's offices pursuant to their statutory examination powers.

for fines and penalties, or for insuring compliance with the laws of the United States administered by the United States Customs Service. . . .

*Id.* (emphasis supplied). Thus, Sunlight cannot be said to have been put on notice that, due to its industry classification, its records were subject to unannounced examination by Customs.[3]

■ In addition, Defendants Li and Wu have demonstrated the required "nexus between the area searched and [their respective] work space," *Chuang,* 897 F.2d at 649 (quoting *United States v. Britt,* 508 F.2d 1052, 1056 (5th Cir.1975), *cert. denied,* 423 U.S. 825, 96 S.Ct. 40, 46 L.Ed.2d 42 (1975)), with respect to at least some of the seized documents, including those taken from Wu's desk and Li's desk and personal computer. In light of this Court's ruling on the merits of the Fourth Amendment challenge of the Sunlight defendants, however, it is unnecessary to determine precisely to which areas of the office they have established the required connection.

### B. Alleged Falsity of the Affidavit Supporting the Search Warrant

The Sunlight defendants argue that the warrant was based on knowing misrepresentations of material fact, and not upon probable cause. To challenge successfully the sworn statements in a warrant affidavit, a defendant must make substantial preliminary showings on each of three grounds:

(1) that the warrant affidavit includes a false statement,

**3.** The contrast between the examination powers of Customs and the examination powers of the regulators involved in the cases cited by the Government could not be stronger. For example, to distinguish the present case from *Chuang,* 897 F.2d at 650, compare Customs' examinations powers, *see supra* text following note 2, with those of the Office of the Comptroller of the Currency ("OCC"), *see* 12 U.S.C. § 481 (empowering the OCC to conduct a "full and detailed" examination of any national bank, without notice, as often as the OCC deems necessary).

**4.** The concession by the Government in *United States v. Gu,* No. 92 Cr. 789 (JFK) (S.D.N.Y. filed Oct. 5, 1992), regarding the materiality of statements about China National's control of provin-

(2) that the allegedly false statement was made knowingly and intentionally or with reckless disregard for the truth, and

(3) that the allegedly false statement is necessary to a finding of probable cause.

*United States v. U.S. Currency, The Amount of $228,356.00,* 895 F.2d 908, 919 (2d Cir.), *cert. denied,* 495 U.S. 958, 110 S.Ct. 2564, 109 L.Ed.2d 747 (1990); *see also United States v. Levasseur,* 816 F.2d 37, 43 (2d Cir.1987); *United States v. Ferguson,* 758 F.2d 843, 848 (2d Cir.), *cert. denied,* 474 U.S. 1032, 106 S.Ct. 592, 88 L.Ed.2d 572 (1985). These preliminary showings must include both allegations and offers of proof. *See Franks v. Delaware,* 438 U.S. 154, 171, 98 S.Ct. 2674, 2684, 57 L.Ed.2d 667 (1978).

■ The Sunlight defendants claim that two allegations in the affidavit upon which the warrant was based are false, and seek a *Franks* hearing regarding these allegations. First, the Sunlight defendants contend that the allegation in the affidavit regarding the control relationship between China National Textiles Import and Export Corporation ("China National") and Jiangsu Knitwear is false. There is no need to explore this contention, as this Court finds that the challenged statements constitute background material and are not necessary to the showing of probable cause.[4]

■ Second, the Sunlight defendants challenge the allegation that attorneys for All American Apparel—a customer of Jiangsu Knitwear and Sunlight—told Customs agents that All American, Sunlight and Jiangsu

cial export companies such as Jiangsu Knitwear is limited to the different facts of that case. Even if the statements about China National's control of Jiangsu Knitwear were material to the probable cause supporting the warrant against Sunlight, the relevant issue has been decided. In *Gu,* Judge Keenan held a *Franks* hearing on, to quote the Sunlight defendants, the "precise issue" for which they seek a *Franks* hearing in this case. On the basis of that hearing, Judge Keenan concluded that "it is impossible for an objective observer to conclude that there was perjury or recklessness on the side of the Government." *United States v. Gu,* No. 92 Cr. 789 (JFK), 1993 WL 248813 (S.D.N.Y. June 28, 1993). If the challenged statements were material to this case, Judge Keenan's decision would be persuasive.

Knitwear were involved in a complicated scheme to conceal from Customs dutiable quota payments. This scheme allegedly involved disguising quota payments as yarn payments. The Sunlight defendants' challenge to this allegation is insufficient to warrant a *Franks* hearing. The Sunlight defendants have offered thin, if any, proof that the challenged allegation is even false, much less that the allegation was made with reckless disregard for the truth. To support the claim that there was no scheme to disguise quota payments as yarn payments, the Sunlight defendants offer two invoices from Jiangsu Knitwear to All American, one for quota and one for yarn, as examples of invoices which the Sunlight defendants claim that Customs had possessed at the time the affidavit was sworn. Obviously, the fact that Jiangsu Knitwear issued some invoices for quota is in no way inconsistent with Jiangsu Knitwear and Sunlight having concealed other quota payments; thus, possession of these invoices did not require Customs to doubt the allegations of All American's attorney. The Sunlight defendants further offer an affidavit from one of their attorneys, Mr. Russell M. Gioiella, in which Mr. Gioiella states that Customs' source for the allegation—Reid Weingarten, Esq.—informed Mr. Gioiella that "he has no recollection of making the statements which the Government attributes to him" and that another attorney for All American "made virtually all substantive representations to the Government" concerning the relationship between All American and Sunlight.[5] A showing that Customs may have had possession of genuine receipts for quota, in combination with a secondhand statement of a lack of recollection, is insufficient to warrant a *Franks* hearing.

## C. Particularity of the Search Warrant

■ The Fourth Amendment requires that search warrants "particularly describ[e] the place to be searched, and the persons or things to be seized." U.S. Const. Amend. IV. This requirement "guards against general searches that leave to the unguided discre-tion of the officers executing the warrant the decision as to what items may be seized." *U.S. v. Riley*, 906 F.2d 841, 844 (2d Cir.1990) (citing *Andresen v. Maryland*, 427 U.S. 463, 480, 96 S.Ct. 2737, 2748, 49 L.Ed.2d 627 (1976)); *accord Marron v. United States*, 275 U.S. 192, 196, 48 S.Ct. 74, 76, 72 L.Ed. 231 (1927). The warrant at issue limited the discretion of the Customs agents executing it both in terms of the form of evidence to be seized—documents of the type illustrated in the warrant—and the nature of evidence—those documents related to importing and to specified crimes.

With respect to the form of evidence, a warrant's "description of property will be acceptable if it is as specific as the circumstances and nature of activity under investigation permit." *United States v. Wuagneux*, 683 F.2d 1343, 1349 (11th Cir.1982), *cert. denied*, 464 U.S. 814, 104 S.Ct. 69, 78 L.Ed.2d 83 (1983). In this case, Customs had probable cause to believe that documentation of certain Customs offenses would be found in Sunlight's offices, but there would have been no way for Customs to know the exact form that the evidence would take. Thus, it was reasonable for the warrant to provide an illustrative list of the type of documents that might be seized, but not to limit the search to only those documents listed, in case a different document containing evidence of the suspected crimes was discovered. *See United States v. Scharfman*, 448 F.2d 1352, 1355 (2d Cir.1978) ("When circumstances make an exact description of instrumentalities ... a virtual impossibility, the searching officer can only be expected to describe the generic class of items he is seeking."); *United States v. Riley*, 906 F.2d 841, 844 (2d Cir.1990) (upholding against attack of generality warrant that "supplied sufficient examples of the type of records that could be seized—bank records, business records, and safety deposit records").

It is significant that the warrant permitted seizure only of "documents" or "records."

---

5. Mr. Gioiella also relates statements made to him by Frank J. Desiderio, Esq., another attorney for All American. However, according to three Customs agents present when the statement un-derlying the allegation was made, it was Mr. Weingarten, not Mr. Desiderio, who made the statement underlying the allegation contained in the warrant affidavit.

Moreover, the warrant specified the nature of the documents to be seized, by references to "all records relating to the importation of merchandise into the United States, including all documents sent to United States Customs," and to "other records which are evidence and instrumentalities" of enumerated crimes: 18 U.S.C. § 371 (conspiring to defraud the United States), 18 U.S.C. § 541 (importing goods while underpaying duties), 18 U.S.C. § 542 (importing goods by means of false statements), 18 U.S.C. § 545 (smuggling); 18 U.S.C. § 1001 (making false statements to a U.S. agency), and 18 U.S.C. §§ 981, 1956, and 1957 (money laundering).

The Sunlight defendants argue that the references to broad criminal statutes such as 18 U.S.C. § 371 widen the scope of the warrant to impermissible dimensions. It is true that "[m]ere reference to 'evidence' of a violation of a broad criminal statute or general criminal activity provides no readily ascertainable guidelines for the executing officers as to what items to seize." *United States v. George*, 975 F.2d 72, 74 (2d Cir.1992) (invalidating warrant for "[o]ther evidence relating to the commission of a crime"); *see also Voss v. Bergsgaard*, 774 F.2d 402, 405 (10th Cir. 1985) (invalidating warrant for evidence of violations of 18 U.S.C. § 371); *In re Lafayette Academy, Inc.*, 610 F.2d 1, 3–6 (1st Cir.1979) (invalidating warrant for evidence of violations of 18 U.S.C. §§ 286, 287, 371, 1001, 1014, statutes which "penalize a very wide range of frauds and conspiracies"); *United States v. Leary*, 846 F.2d 592, 601–02 (10th Cir.1988) (invalidating warrant for evidence relating to "the purchase, sale and illegal exportation of materials in violation of the Arms Control Export Act, 22 U.S.C. 2778, and the Export Administration Act of 1979, 50 U.S.C.App. 2410").

■ However, the warrant at issue includes significantly more than a "mere" reference to broad criminal statutes and, thus, such references must be read in the context of the rest of the warrant. Where, as in this case, a warrant cites narrow criminal statutes together with broad criminal statutes

that proscribe conduct that is ancillary to the conduct described in the narrower statutes, common sense dictates that any reading of the scope of the broad statutes be informed by reference to the narrower statutes. Thus, reference to the substantive crime of importing goods while underpaying duties gives meaning to, and narrows, the reference to conspiracy to defraud the United States government; reference to the crime of importing by means of false statements cabins the interpretation of the crime of making false statements to a U.S. agency; and reference to all of the Customs crimes confines the scope of the references to the statutes prohibiting the laundering of the proceeds of "illegal activity." Likewise, reading the references to these broad crimes in the context of the limitations on the nature of the evidence sought, including the explicit references to records relating to importing, reinforces the constraints on their scope. In light of the warrant's guidance as to both the form and nature of the evidence to be seized, this court concurs with Judge Keenan—who assessed the particularity of the same warrant in the related case of *United States v. Gu*, No. 92 Cr. 789 (JFK), 1993 WL 190347 (S.D.N.Y. June 2, 1993)—that the warrant at issue was sufficiently particular.

## II. ALLEGED MULTIPLICITY OF THE CHARGES

■ The defendants argue that the indictment arbitrarily divides each alleged statutory violation into calendar years, thereby multiplying each alleged violation of a statutory provision into three separate counts. This argument need be met with nothing more than the observation that the Government could have charged each transaction that allegedly violated a statutory provision as a single count, rather than grouping these transactions into calendar years for the sake of convenience.

■ The defendants also claim that Counts Two through Ten of the indictment— which charge violations of 18 U.S.C. §§ 541,[6]

---

**6.** This statute reads:

Whoever knowingly effects any entry of goods, wares, or merchandise, at less than the true

weight or measure thereof, or upon a false classification as to quality or value, or by the payment of less than the amount of duty legally due, shall

542,[7] and 545 [8]—are impermissibly multiplicitous in that each count does not require proof of facts in addition to facts required to be proved under the other counts. Whether a defendant can charged under multiple statutory provisions for a single act depends upon whether the legislature intended multiple punishments for a single act. *See Missouri v. Hunter*, 459 U.S. 359, 368–69, 103 S.Ct. 673, 679, 74 L.Ed.2d 535 (1983). This determination of legislative intent entails a three-step inquiry:

1) If the offenses charged are set forth in different statutes or distinct sections of a statute, and each section unambiguously authorizes punishment for a violation of its terms, it is ordinarily to be inferred that Congress intended to authorize punishment under each provision. 2) It must next be determined whether the two offenses are sufficiently distinguishable from one another that the inference that Congress intended multiple punishments is a reasonable one. The *Blockburger* test is employed in making this determination. Under *Blockburger v. United States:*

The applicable rule ·is that where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not.

3) If *Blockburger* is satisfied, the final step is to test the tentative conclusion that multiple punishments are authorized against the legislative history of the statutory provisions to discover whether a contrary Congressional intention is disclosed. If the legislative history either reveals an intent to authorize cumulation of punishments or is silent on the subject, the court should conclude that Congress intended to authorize multiple punishments.

*United States v. Nakashian*, 820 F.2d 549, 551 (2d Cir.) (footnotes and citations omitted), *cert. denied*, 484 U.S. 963, 108 S.Ct. 451, 98 L.Ed.2d 392 (1987); *United States v. Fiore*, 821 F.2d 127, 130 (2d Cir.1987) (same).

Under the first step of the inquiry, the offenses charged in Counts Two through Ten are based on three separate statutory provisions, each of which carries an express penalty for its violation.[9] Thus, the first step of the multiplicity inquiry establishes the inference that Congress intended punishments for violations of each provision.

---

be fined not more than $5,000 or imprisoned not more than two years, or both.

**7.** This statute reads, in relevant part:

Whoever enters or introduces, or attempts to enter or introduce, into the commerce of the United States any imported merchandise by means of any fraudulent or false invoice, declaration, affidavit, letter, paper, or ·by means of any false statement, written or verbal, or by means of any false or fraudulent practice or appliance, or makes any false statement in any declaration without reasonable cause to believe the truth of such statement, or procures the making of any such false statement as to any matter material thereto without reasonable cause to believe the truth of such statement, whether or not the United States shall or may be deprived of any lawful duties; or

Whoever is guilty of any willful act or omission whereby the United States shall or may be deprived of any lawful duties accruing upon merchandise embraced or referred to in such invoice, declaration, affidavit, letter, paper, or statement, or affected by such act or omission—

Shall be fined for each offense not more than $5,000 or imprisoned not more than two years, or both.

**8.** This statute reads, in relevant part:

Whoever knowingly and willfully, with intent to defraud the United States, smuggles, or clandestinely introduces into the United States any merchandise which should have been invoiced, or makes out or passes, or attempts to pass, through the customhouse any false, forged, or fraudulent invoice, or other document or paper; or

Whoever fraudulently or knowingly imports or brings into the United States, any merchandise contrary to law, or receives, conceals, buys, sells, or in any manner facilitates the· transportation, concealment, or sale of such merchandise after importation, knowing the same to have been imported or brought into the United States contrary to law—

Shall be fined not more than $10,000 or imprisoned not more than five years, or both.

Proof of defendant's possession of such goods, unless explained to the satisfaction of the jury, shall be deemed evidence sufficient to authorize conviction for violation of this section.

**9.** To the extent that the Counts are based on the same statute, they are based on different underlying facts, and do not give rise to questions of multiplicity, other than those addressed in the first paragraph of this section of this order.

The second step of the inquiry—application of the *Blockburger* test—essentially involves determining the degree of overlap of the statutes. In undertaking this inquiry, individual statutory subsections may be used as the basis for comparison where Congress intended that each subsection constitute a separately punishable crime. *See United States v. Bagaric,* 706 F.2d 42, 63 n. 18 (2d Cir.), *cert. denied,* 464 U.S. 840, 104 S.Ct. 133, 78 L.Ed.2d 128 (three separate denials of petitions for certiorari), *and cert. denied,* 464 U.S. 917, 104 S.Ct. 283, 78 L.Ed.2d 261 (1983). However, despite the contrary assumptions of both the Government and the defendants, Section 541 cannot be subdivided into clauses for the purposes of *Blockburger* analysis. Section 541 consists of only one sentence which prescribes a single penalty for its violation—strongly suggesting that Congress did not intend that three separately punishable crimes be fashioned out its three internal clauses. This conclusion is reinforced by the interrelatedness of the evils that the three clauses of Section 541 address.

In contrast, Section 542 "punishes two distinct offenses." *United States v. Yip,* 930 F.2d 142, 147 (2d Cir.), *cert. denied,* — U.S. —, 112 S.Ct. 197, 116 L.Ed.2d 157 (1991), and thus only its second paragraph—which underlies the charges against the defendants—should be considered in the *Blockburger* analysis. Similarly, each paragraph of Section 545(2) creates a separately punishable offense. *See Olais–Castro v. United States,* 416 F.2d 1155, 1158 (9th Cir.1969). Thus, for the purposes of applying the *Blockburger* test, this court will assess the overlap among Section 541, the second paragraph of Section 542 ("Section 542(2)"), and the second paragraph of Section 545 ("Section 545(2)")—that is, the provisions that Counts Two through Ten charge the defendants with violating.

These provisions will be compared on the basis of the their statutory text, without reference to the factual allegations in the indictment. The general rule is that statutes are to be read in the abstract, without reference to the indictment. *See United States v. Seda,* 978 F.2d 779, 781 (2d Cir.1992) (citing *Fiore,* 821 F.2d at 131 n. 5); *see also United States v. Dixon,* — U.S. —, —, 113 S.Ct. 2849, 2867, 125 L.Ed.2d 556 (1993) ("[o]ur double jeopardy cases applying *Blockburger* have focused on the statutory elements of the offenses charged, not on the facts that must be proven under the particular indictment at issue") (Rehnquist, C.J., concurring in part and dissenting in part); *id.* — U.S. at —, 113 S.Ct. at 2882 ("the determination whether two statutes describe the 'same offense' for multiple punishment purposes has been held to involve only a question of statutory construction") (Souter, J., concurring in part and dissenting in part). As an exception, the application of the statutes in the indictment may be considered only where "one of the statutes covers a broad range of conduct." *Seda,* 978 F.2d at 781; *see also Whalen v. United States,* 445 U.S. 684, 694, 100 S.Ct. 1432, 1439, 63 L.Ed.2d 715 (1980).[10] However, there is no such broad statute at issue in the present case that would warrant recourse to the exception.[11]

Applying the *Blockburger* test, Section 541 duplicates neither Section 542(2) nor Section 545(2)—nor the two latter provisions in combination—because Section 541 requires proof that the defendants "effect[ed] an entry of goods." In contrast, Section 542(2) does not require this fact to be proven. *See Yip,* 930 F.2d at 149. Further, while Section 545(2) requires that goods have been imported into the United States, it does not require that the defendants themselves effected the importation. Thus, both Sections 542(2) and 545(2) could be violated without violating Section 541.

---

10. Doubts have been raised about whether, in applying the *Blockburger* test, courts even have the authority to consider how the statutes are applied in the indictment. *See Nakashian,* 820 F.2d at 552 n. 7, and cases cited therein.

11. The defendants point to *United States v. Avelino,* 967 F.2d 815, (2d Cir.1992) and *United States*

*v. Rose,* 570 F.2d 1358, (9th Cir.1978) as cases within the exception which involve "one of the statutes at issue in the present case," Section 542. However, both cases also involve 18 U.S.C. § 1001, and it is obvious that this is the broad statutory provision that warranted the exceptional analysis in these cases.

Likewise, Section 542(2) does not duplicate either or both of Sections 541 and 545(2). Section 542(2) requires that "the defendant willfully undertook an act or omission that he knew or should have known would result in depriving the government of customs duties." *Yip*, 930 F.2d at 147. In contrast, Section 541 does not require the defendant's knowledge, either actual or constructive, that the United States would be deprived of customs duties by his acts. While one basis of liability under Section 541 requires "payment of less than the amount of duty legally due," alternative bases of liability require only entry of goods "at less than true weight or measure . . ., or upon a false qualification as to quality or value." Similarly, Section 545(2) does not require this element of deprivation of Customs duties to be proven. *See United States v. McKee*, 220 F.2d 266, 269 (2d Cir.1955).

Finally, Section 545(2) does not duplicate Section 541 or Section 542(2), either individually or in combination. By its terms, Section 545(2) requires an importation that the defendant knew to be contrary to law, whereas Section 542(2) does not even require an importation, and Section 541 does not require that the defendant knew the importation was contrary to law.

Thus, the second step of the multiplicity inquiry warrants the tentative conclusion that Congress authorized multiple punishments under Section 541, Section 542(2) and Section 545(2). With regard to the third step, the Sunlight defendants have not brought to this Court's attention any legislative history that reveals a contrary congressional intention. Accordingly, Counts Two through Ten of the indictment do not implicate impermissible multiple punishments.

## III. SEVERANCE OF THE TAX CHARGES

The defendants have moved to sever the tax charges, and the Government has consented to this motion. Therefore, this Court orders Count Seventeen of the indictment to be severed.

## IV. SEVERANCE OF DEFENDANT WU

Defendant Wu argues that it would be prejudicial to try him along with the other defendants for two primary reasons. First, it would deprive him of exculpatory testimony by Defendant Li. Second, Wu argues that because he was charged only with conspiracy to defraud Customs, and not with any of the underlying crimes, most of the evidence introduced at trial will be peripheral to the charges against him.

In the course of addressing the *Finkelstein* criteria—which the Second Circuit enunciated to "assist," but not "delimit," trial courts in assessing whether the probative potential of a co-defendant's prospective testimony overcomes the judicial diseconomy of a separate trial, *see United States v. Finkelstein*, 526 F.2d 517, 523–24 (2d Cir.1975), *cert. denied*, 425 U.S. 960, 96 S.Ct. 1742, 48 L.Ed.2d 205 (1976)—Wu argues that Li would be likely to testify on Wu's behalf if a severance were granted, and that Li's testimony would be probative of Wu's innocence. Wu supports the first point by an affidavit in which Li expresses his willingness to testify on Wu's behalf "at a *separate* trial . . . regardless of the outcome of my trial" (emphasis in original). The essence of Li's prospective testimony would be that Wu had no knowledge of transactions that appear to be at the heart of the Government's case. Wu supports his second argument by pointing to the concurrence between Li's potential testimony and the failure of the evidence "which will undoubtedly form the great bulk of the Government's proof in the case" to implicate Wu.

The essence of Wu's arguments with respect both to Li's testimony and to the possible "spillover" effect is that there is simply no evidence that Wu was involved in the alleged conspiracy and that, therefore, Li's testimony is crucial to prevent Wu from being convicted merely by association with Li. However, Wu's argument leads this Court to a very different conclusion. If the case against Wu turns out to be as weak as he claims, Li's testimony is of very little probative value. In this light, there is no risk of sacrificing Wu's "right to a fundamentally fair trial" to the pressing demands of judicial

economy. *United States v. DePalma,* 466 F.Supp. 920, 923 (S.D.N.Y.1979) (quoting *United States v. Shuford,* 454 F.2d 772, 776 (4th Cir.1971)). If, at the conclusion of the Government's case, insufficient evidence of Wu's complicity is introduced, other than the mere facts that Wu worked in the same office and lived in the same house as Li, this Court will grant a motion to dismiss the charges against Wu. More to the point, Li's offer of proof that he would testify that Wu lacked knowledge of the transactions at issue is highly generalized and implies inadmissible, subjective conclusions. In addition, the offer of proof suggests a high likelihood of effective impeachment by the Government. Finally, we find the Government's arguments on the application of the *Finkelstein* criteria to be highly persuasive—*see* Government's Memorandum of Law in Opposition to Defendants' Pre–Trial Motions, at 60–65—and are satisfied that a convincing case for a severance has not been made by Defendant Wu. Accordingly, Wu's motion for severance is denied.

## V. REQUEST FOR A BILL OF PARTICULARS

 The Sunlight defendants seek a bill of particulars addressing three points. Two of these points concern the tax counts, which are to be severed; thus, the Court will consider only the first aspect of the Sunlight defendants' request at this time. The Sunlight defendants seek a bill of particulars setting forth "the identity of any document alleged to contain a false statement" in violation of Section 542(2) and "the identity of any such false statement;" or alternatively, if the Government is claiming that the false statements were made in either invoices or quota declarations, a bill of particulars indicating the type of document in which the false statements were allegedly made.

In their response, the Government provides a list of thirty so-called "entry packets"—packets of documents submitted to Customs in connections with specific importations of goods—underlying the alleged vio-

lations of Section 542(2), and twenty-four entry packets that the Government indicated it may introduce as further proof of the alleged Section 542(2) violations. Still the Sunlight defendants want more particulars, and reiterate in their reply brief their request for the identification of the specific statements contained in those entry packets that are alleged to be false.

While the Government's disclosure did not satisfy the Sunlight defendants, it did satisfy the Government's obligation. In the indictment, the Government specifies the dollar amounts, per calendar year, of the "declared price" of imported merchandise, the "actual price" of the merchandise, the "undeclared value," and the "duties evaded." The unequivocal implication of these captions, in the context of the violations charged, is that the "declared price" figures that are specified in the indictment constitute the allegedly false statements. There is no requirement that the Government reveal its precise legal theory of the fraudulent statements by identifying which components of these declared prices are false. *See United States v. Caine,* 270 F.Supp. 801, 804 (S.D.N.Y.1967) (upholding an indictment for fraud, where indictment failed to select between two alternative theories of fraud).

In combination with the Government's identification of individual entry packets containing the information, including declared values, underlying the figures contained in the indictment, the allegations in the indictment provide the Sunlight defendants with more than sufficient notice of the charges against them "to prepare for trial, to prevent surprise, and to interpose a plea of double jeopardy should [they] be prosecuted a second time for the same offense." *United States v. Bortnovsky,* 820 F.2d 572, 574 (2d Cir.1987).

## VI. DEMANDS FOR FURTHER DISCOVERY

The Sunlight defendants have made two relevant requests for further discovery.[12]

---

12. The Sunlight defendants also make a request, conditional upon the outcome of its motion for a bill of particulars regarding the tax count, for

any evidence of specified currency regulation avoidance by Chinese companies. In light of the

First, they seek all documents that will be used in the Government's case in chief, and if all of these documents are included in the voluminous materials that the Government has already turned over, they seek a list of the Government's exhibits. At a conference before this Court on September 15, 1993, we were satisfied that the Government has been turning over exhibit lists to the defendants in a timely manner.

■ Second, the Sunlight defendants seek any information in the Government's possession that tends to prove that so-called "price differences"—differences between the prices listed on invoices and the amounts actually paid by importers—are widely used for legitimate reasons by importers of goods from China. The Sunlight defendants believe that such evidence exists within the "trove of documentary information from over 20 exporters, sales agents and importers" that the Government collected during its extensive investigation of Chinese imports. The Sunlight defendants argue that the requested information would be exculpatory and, thus, they are entitled to it under the *Brady* doctrine. *See Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

However, the Sunlight defendants do not make a convincing argument that the Government is suppressing evidence that is material to their defense. Under *Brady* and its progeny, evidence is material only if there is a "reasonable probability" that it will affect the outcome of the trial. *See United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985). The "mere possibility" that the evidence might help the defense does not establish materiality. *See United States v. Agurs,* 427 U.S. 97, 109–10, 96 S.Ct. 2392, 2400, 49 L.Ed.2d 342 (1976). Assuming that the Government possesses the evidence that the Sunlight defendants seek,[13] such evidence would be marginal to the Sun-

light defendants' defense, and thus is not sufficiently likely to affect the outcome of the trial to require disclosure under the *Brady* doctrine.

The requested evidence would speak rather softly in opposition to the theory of criminal liability anticipated by the Sunlight defendants. The Sunlight defendants make their *Brady* request in order to defend against any charge that awareness by them of price differences "put [them] on notice that the importer was defrauding Customs and avoiding duty." In response, they would like to be able to claim "that the existence of a 'price difference' is consistent with a general practice of Chinese importers and exporters" unrelated to the avoidance of Customs duties. But, even if the Government's case on the false statement counts is limited to this theory, the response that the Sunlight defendants plan to make omits a crucial element: their own knowledge of industry practice. As articulated by the Sunlight defendants, the issue is one of notice; thus, the success of their defense on this issue must depend on their ability to establish their own knowledge of industry practice, not its mere existence.

■ Moreover, "evidence should be considered material 'if [it] creates a reasonable doubt that *[would] not otherwise exist* as to the defendant's guilt." *United States v. Srulowitz,* 785 F.2d 382, 388 (2d Cir.1986) (quoting *Agurs,* 427 U.S. at 112, 96 S.Ct. at 2401) (emphasis supplied). Evidence of the Sunlight defendants' knowledge of industry practice also would demonstrate the existence of industry practice and, therefore, evidence of industry practice, taken alone, would add little. Of course, if the Sunlight defendants were to testify that they knew the industry custom to be as they allege, evidence of the existence of the alleged industry custom would corroborate their testimony. Howev-

severance of the tax count, the Court reserves decision on this request at this time.

**13.** It is significant that the Sunlight defendants seek evidence "which would establish that a 'price difference' was routinely paid by United States importers to exporters for *legitimate* purposes unrelated to the invoice price of the goods." (emphasis supplied). If, as it appears

will be likely, one of the issues in the instant case is whether price differences are evidence of avoidance of customs duties, it is unclear how to determine whether other importers were using price differences for "legitimate" purposes, short of conducting trials to determine whether the other importers have violated Customs laws.

er, merely corroborative evidence cannot be said to be material in the *Brady* context. *See Nassar v. Sissel,* 792 F.2d 119, 122 (8th Cir.1986).

 Further, it is well established that *Brady* and its progeny do not require the Government to disclose information about the existence of exculpatory evidence where the defense has, or should have, access to that information. As the Second Circuit has made clear,

> "[t]he rationale underlying *Brady* is not to supply a defendant with all the evidence in the Government's possession which might conceivably assist the preparation of his defense, but to assure that the defendant will not be denied access to exculpatory evidence *only* known to the Government." *United States v. LeRoy,* 687 F.2d 610, 619 (2d Cir.1982) (emphasis added), *cert. denied,* 459 U.S. 1174, 103 S.Ct. 823, 74 L.Ed.2d 1019 (1983). Thus, *Brady* requires the prosecutor neither "to deliver his entire file to defense counsel," *United States v. Bagley,* 473 U.S. 667, 675, 105 S.Ct. 3375, 3380, 87 L.Ed.2d 481 (1985), nor to make a disclosure if "the defendant knew or should have known the essential facts permitting him to take advantage of any exculpatory evidence." *United States v. Gaggi,* 811 F.2d 47, 59 (2d Cir.), *cert. denied,* 482 U.S. 929, 107 S.Ct. 3214, 96 L.Ed.2d 701 (1987).

*Tate v. Wood,* 963 F.2d 20, 25 (2d Cir.1992). Consistent with this underlying rationale, *Brady* does not require the Government to turn over evidence if the defense has, or should have, access to equally probative evidence because, under these circumstances, the evidence withheld cannot said to be material. *See United States v. McMahon,* 715 F.2d 498, 501–02 (11th Cir.), *cert. denied,* 464 U.S. 1001, 104 S.Ct. 507, 78 L.Ed.2d 697 (1983), *and cert. denied,* 465 U.S. 1065, 104 S.Ct. 1413, 79 L.Ed.2d 739.[14]

The practices of a $4 billion industry [15] should have myriad sources of proof, and industry insiders such as the Sunlight defendants should have ample access to these sources. Were they to claim otherwise, their defense of knowledge of industry practices, the basis of their *Brady* request, would be highly suspect. In denying the Sunlight defendants' *Brady* request, the Government refused to turn over evidence concerning businesses with no connection to the instant prosecution. Such evidence is extremely unlikely to have any bearing on the Sunlight defendants' knowledge of industry practice, and to the extent that it confirms the industry practice *per se,* it is likely to add little to evidence in the Sunlight defendants' possession. More promising sources of probative evidence of the Sunlight defendants' knowledge of industry practices are Sunlight's own files and Jiangsu Knitwear's files.

In sum, it is far from clear that the Government possesses evidence that price differences are widely used by importers of goods from China for "legitimate" reasons. Regardless, in order to prevail against the theory of criminal liability that forms the basis of their *Brady* request, the Sunlight defendants would have to prove their knowledge of industry practice, relegating the mere existence of the practice to a marginal role in their defense. To the extent the existence of the practice may play a secondary role in their defense, the Sunlight defendants should have access to evidence of the practice that is as probative as any evidence possessed by the Government, if not more probative because it would also demonstrate their knowledge of the practice. In this context, the Government's failure to disclose any evidence

---

**14.** It is important to note that this Court is not ruling that the Government is not "suppressing" any evidence of industry practice that it has not made available to the defense. Such a ruling would be appropriate only if the Government were withholding evidence, yet the defense had access to the identical evidence. *See United States v. Esposito,* 834 F.2d 272, 275–76 (2d Cir.1987); *United States v. White,* 970 F.2d 328, 336–37 (7th Cir.1992).

**15.** Textile imports from the People's Republic of China during 1991 were officially estimated to be worth $3.89 billion. *See* Testimony of Carol Hallett, Commissioner, U.S. Customs Service, before the Subcomm. on Oversight and Investigations of the House Energy and Commerce Comm., 102nd Cong., 2d Sess., at 3 (May 7, 1992) (attached as Exhibit A to Defendants' Affidavit in Support of Joint Motions).

of industry practice that it obtained from entities not involved in the instant prosecution would not affect the outcome of the trial.

Accordingly, the defendants' contested motions are in all respects denied.

SO ORDERED.