**UNITED STATES of America,**
**Appellee,**

v.

**Raymond Richard STEPHENSON, aka Andrew McCurvin, aka Anthony McCurvin, Defendant–Appellant.**

**Docket No. 98–1490.**

United States Court of Appeals,
Second Circuit.

Argued March 1, 1999.

Decided June 30, 1999.

Alex V. Hernandez, Assistant United States Attorney for the District of Connecticut (Stephen C. Robinson, United States Attorney, of counsel), Bridgeport, Connecticut, for Appellee.

Conrad O. Seifert, Seifert & Hogan, Old Lyme, Connecticut, for Defendant–Appellant.

Before: WINTER, Chief Judge, JACOBS, Circuit Judge, and SAND, District Judge.*

WINTER, Chief Judge:

Andrew McCurvin, also known as Raymond Richard Stephenson, appeals from his conviction after a jury trial and from a sentence of 336 months' imprisonment imposed by Judge Covello. At issue are convictions for conspiracy to possess with intent to distribute cocaine and cocaine base ("crack"), in violation of 21 U.S.C. §§ 841(a)(1) and 846; of possession with intent to distribute cocaine and crack, in violation of 21 U.S.C. § 841(a)(1); of possession of a firearm by a prohibited person, in violation of 18 U.S.C. §§ 922(g)(1)

* The Honorable Leonard B. Sand, of the United States District Court for the Southern District of New York, sitting by designation.

and (g)(5); of money laundering in connection with the purchase of an Acura Legend, in violation of 18 U.S.C. § 1956(a)(1)(B)(i); and of money laundering in connection with McCurvin's wife's placement of drug proceeds in a safe deposit box, in violation of 18 U.S.C. § 1956(a)(1)(B)(i).[1]

We hold that the government failed to prove money laundering in connection with McCurvin's purchase of a 1992 Acura Legend and therefore vacate the guilty verdict on Count 28. We remand for whatever proceedings are appropriate. Finding no merit in McCurvin's other arguments, we otherwise affirm.

## BACKGROUND

We view the evidence in the light most favorable to the government. *See Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942). In July 1992, FBI Special Agent William S. Reiner, Jr. began a narcotics investigation of McCurvin, a convicted felon and Jamaican national illegally in the United States. Court-authorized wiretaps of his portable cellular and residential telephones played a major role in the investigation and trial.

As a result of information provided by a confidential informant, Reiner arranged a meeting between McCurvin and another FBI undercover agent, Juan Jackson, who held himself out as the informant's friend. On February 25, 1993, McCurvin made his first of a total of ten crack sales to Jackson. These sales are not seriously disputed and involved over 1300 grams of crack. On April 29, 1993, Jackson and appellant traveled together to a car dealership called Tri Auto, located in Milford, Connecticut, to negotiate the purchase of an automobile. Jackson was wearing recording and transmitting devices at the time. Appellant told Jackson he could pay cash for the vehicle "without any particular Id. or driver's license." When McCurvin and Jackson arrived at Tri Auto, a car salesman by the name of Greg Mallard explained to Jackson that the dealership was "a big laundromat."

On May 7, 1993, Jackson and McCurvin again traveled together to Tri Auto. Jackson was again wearing recording devices. They first discussed the need to conceal drug proceeds. McCurvin explained that he stored his proceeds in a safe deposit box for that purpose. They also talked about the need to avoid triggering the $10,000 cash reporting requirement when purchasing an automobile:

JJ: Yeah, cuz there, there's a law they got to do something about a certain amount of money.

AM: Yeah, 10,000.

JJ: Yeah.

AM: But you ain't going to give it at one time. That's when you give it to the person one time.

JJ: Right.

AM: If you come in today and give me 5 and come tomorrow and give me 5. There's nothing. You know what I mean. But when you just come in one time and hand $10,000.

JJ: But that's the way Greg and them do it. They're cool.

---

1. The jury acquitted McCurvin on two counts of money laundering in connection with his purchase of two other automobiles. The district court subsequently vacated, pursuant to *Bailey v. United States*, 516 U.S. 137, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995), the guilty verdicts regarding the use and carrying of a firearm during and in relation to a narcotics trafficking offense and, on April 4, 1996, sentenced McCurvin on the remaining counts to 360 months' imprisonment and ten years of court-supervised release. Trial counsel failed to file a timely notice of appeal.

On January 27, 1997, McCurvin filed a Section 2255 motion in order to reinstate his right to appeal. *See* 28 U.S.C. § 2255. Substitute counsel was thereafter appointed to represent McCurvin, and his motion to vacate the sentence was granted. After downwardly departing on the ground of post-arrest rehabilitation, the district court resentenced McCurvin on July 20, 1998, to 336 months' imprisonment and a ten-year term of supervised release.

On May 12, 1993, while conducting surveillance of McCurvin, Special Agent Joseph McTague of the Internal Revenue Service followed McCurvin's wife, Antoinette, to the Bank of Boston in Waterbury, Connecticut. He watched as she descended stairs to the area of the bank that contains safe deposit boxes. Later that day, Antoinette was recorded having the following conversation with a Claudia Pringle:

CP: Hello.

ANT: This one call has him getting back at me. We had a big fight this morning, you know. Right.

CP: That's why you never called back.

ANT: Yeah, we had a big fight. I done broke three nails, whatever. He told me to go get his money out of the safe deposit box, so I did. . . .

CP: Where you been this morning?

ANT: I went to the bank. . . .

On May 18, 1993, McCurvin was intercepted discussing the possible purchase of an Acura Legend with someone by the name of Dave:

A: Um. Dave, listen now what I'm sayin, now all these cars lists now for 15–5.

D: That's what they're callin for.

A: Yeah.

D: That's a lot of money.

A: Lotta money, no, the Legend is a 92 Legend, and light flood.

D: Yup.

. . .

A: They want 17–5 for it.

D: Yeah, but you can go down there with 15 and you gotta car. You know what I mean?

A: Go down there with 15?

D: Yeah.

A: But that's what I'm saying. I mean, you know, you can't give them over 10,000, they gotta report it.

D: Oh, really.

A: You never know that.

D. No.

A: Yeah, I went to go fuckin look at this 300E.

D: Yeah.

A: They say once I give them over 10,000, they gotta report it.

D: No shit?

A: Um hum. So that's what I'm trying to figure. Now how would I do that? You know what I'm saying? That shit is crazy.

D: How would you do that? I would buy the car.

A: Huh?

D: Put the . . . go down there as Gravel's Automotive and buy the car. And then this way, it never hits you then, ah, then we fuckin sell it to you for fucking under ten whatever.

That same day, McCurvin was again intercepted discussing the possible purchase of an Acura Legend with a person named Chris:

A: Chris?

C: Yeah.

A: Yeah, um, I'm trying to figure if you still get a 92 Legend. . . .

. . .

C: Yeah, I have it.

A: You got that 92 Legend, light flood?

C: No, that has been sold.

A: That been sold?

C: I have a 91, 91, um, Acura Legend, flood doesn't drive.

A: How much you want for that?

C: 16–5.

A: 16–5?

C: Yeah.

. . .

A: But you basically, listen to what I'm sayin, um, how about like you could use credit card, right?

C: No, everything is cash and carry.

. . .

A: How about the stuff that is like 22,000. I mean if you come up with that

22,000, then you ain't gotta report to the federal government.

C: Yeah, that's the law. That or a certified check, whatever easier for you. Cash or certified check.

A: Cash or certified check?

C: Yeah.

A: Damn. All right then, so, um, I think I'm come down later then.

On May 19, 1993, McCurvin purchased a 1992 Acura Legend under a financing agreement with Tri Auto. Later that evening, Antoinette was intercepted over her residential telephone discussing with Claudia Pringle how to structure cash payments for an automobile in order to avoid federal cash transaction reporting requirements:

ANT: You know how much he told me his car payments are a month? $500 and somethin. Can you fuckin believe that, Claudia?

CP: You gotta pay car payments on it? That fuckin car is $37,000.

. . .

ANT: It's pissin me off but [he said] Antoinette, I'm just gonna pay $2,000 a month and just pay it off until I pay it off. . . .

CP: Antoinette, listen, even though Andrew got the money, you see, you know. What the car dealer told me up here? If you fuckin pay $7,000 and over, give them cash,

ANT: No $10,000.

CP: They tell the Feds on you.

ANT: They did, they have to. They have to, so that's why he said couldn't put no more down than what he did that's why the car payments are high. Because you can't give them more than a certain amount of money or they have to call it in.

That same day, Antoinette was again intercepted over her residential telephone explaining to her friend:

But listen, now, so, what's today, Wednesday. yesterday he beeped Shabba.

No called down the store cuz I said I just said I saw Shabba at the bank so he gave me the money back to go put back in the safe deposit box, right. So I told him, look, you can get in an argument with me if you want I'm not going back down there. I'm not running down there every time you get in an argument. You tell me go run and get your money, I'm not doing it. So, I saw Shabba now in the bank when I went down to put the money.

On July 13, 1993, the FBI and members of other law enforcement agencies executed a search warrant at McCurvin's residence and arrested McCurvin and Antoinette. During the search, approximately ten ounces of cocaine were seized from the kitchen cabinet. Two microwave ovens, each of which contained trace amounts of cocaine, were seized from the kitchen. The agents also recovered baking soda, an ingredient necessary for the production of crack; an empty box for a portable cellular phone; a triple beam scale; a 64-ounce glass coffee pot containing crack residue; an electronic paging device; two safe deposit keys corresponding to a Bank of Boston safe deposit box located in Waterbury, Connecticut; a photographic identification card with defendant's photograph made out in the name of Anthony McCurvin; identification cards in the name of Antoinette McCurvin; documents reflecting the purchase of a number of automobiles; Western Union wire transfer receipts totaling $3,534; and a receipt made out in the name of Antoinette McCurvin for Bank of Boston safe deposit box number 3557.

Later that day, the FBI executed a search warrant at the Bank of Boston in Waterbury and opened safe deposit box number 3557. Inside the box, they discovered $27,800 in cash and a birth certificate for the McCurvins' child. Eighty-one bills totaling $1,710 were identified as prerecorded "buy money" that Jackson had used to purchase crack from McCurvin.

On the morning of January 18, 1995, after the case had been submitted to the jury, but before the jury had begun deliberations for that day, Reiner and McTague—both of whom had testified for the government—were instructed to carry trial evidence into the jury deliberation room. The agents knocked on the door and, hearing no answer, walked in. Eight jurors were present. When a juror wished them "good morning," the agents returned the greeting and left. They immediately informed the district court and the parties of their interaction with the jury. The court then conducted a *Remmer* hearing at which it asked each juror if he or she was prejudiced by this encounter. *See Remmer v. United States*, 347 U.S. 227, 74 S.Ct. 450, 98 L.Ed. 654 (1954). Each juror replied in the negative. Based on this voir dire, the court concluded that it was

> simply unable to find a factual basis for a conclusion that a private communication, a contact or a tampering with the jury has, in fact, occurred. The bringing of exhibits into a jury room, and the response "Good morning," to a salutation made by a juror, just does not, in the Court's view, rise to the level of private communication, contact, or tampering that is contemplated by the cases that have addressed this kind of circumstance. Assuming arguendo that this, in fact, did constitute such a contact, the Court . . . conclude[s] that the presumption [of prejudice] . . . is, in fact, rebutted and that the contact was harmless to the defendants.

The jury ultimately convicted McCurvin on all counts but for two money laundering counts involving the purchase of a Honda Accord and a Nissan Maxima from the Tri Auto dealership. The district court later vacated the gun counts relating to narcotics transactions. *See* Note 1, *supra.*

After holding a *Fatico* hearing, *see United States v. Fatico*, 579 F.2d 707 (2d Cir.1978), the district court concluded that McCurvin was responsible for the distribution of 1,340 grams of crack, warranting a base offense level of 36, see U.S.S.G. § 2D1.1(c)(2). The court added four levels pursuant to U.S.S.G. § 3B1.1(a) on the ground that McCurvin was a manager and organizer of criminal activity involving five or more persons, and it added two levels pursuant to U.S.S.G. § 2D1.1(b)(1) on the ground that a firearm was possessed in connection with the offense. McCurvin's offense level of 42 and Criminal History Category III yielded an imprisonment range of 360 months to life. The court sentenced McCurvin to a prison term of 360 months.

On or about April 22, 1998, the government learned that a government witness, one of McCurvin's coconspirators, had lied about his identity. The government promptly notified the district court and defense counsel of this fact.

At McCurvin's July 20, 1998 resentencing, new counsel, *see* Note 1, *supra*, argued that McCurvin should not have received a four-level upward adjustment for his role in the offense because he did not control or manage those to whom he sold crack. Counsel also maintained that McCurvin should receive a downward adjustment for acceptance of responsibility. Finally, he argued that McCurvin should receive a downward departure because of his status as a deportable alien and because of his post-arrest efforts at rehabilitation. Counsel did not, however, move the court for a new trial based on the perjured testimony of the government's witness.

The district court granted McCurvin a two level downward departure based upon his post-arrest rehabilitation and agreed that a four-level upward adjustment based upon McCurvin's role in the offense was not warranted. However, the court found that a two-level upward adjustment was appropriate because McCurvin had managed and directed his wife, Antoinette. The court then denied McCurvin's motion for a downward departure based upon his status as a deportable alien, stating "that on the facts of this case, the requested

departure is not warranted." McCurvin's request for an adjustment for acceptance of responsibility was similarly rejected. In light of the adjustment and downward departure, the district court found McCurvin's adjusted offense level to be 38. With McCurvin's Criminal History Category of III, this resulted in an imprisonment range of 292 to 365 months. The court then resentenced McCurvin to 336 months' imprisonment.

## DISCUSSION

On appeal, McCurvin contends that: (i) the district court should have granted his motion for a mistrial because of the interaction between law enforcement agents and the jury; (ii) the perjured testimony of a government witness requires a new trial; (iii) the testimony of coconspirators pursuant to cooperation agreements violated the anti-gratuity statute, 18 U.S.C. § 201(c)(2); (iv) the disparity in the sentences for cocaine and crack under the Sentencing Guidelines is unconstitutional; (v) there was inadequate evidence that McCurvin was involved with 1,314 grams of crack; (vi) the sentence on the conspiracy conviction was miscalculated; (vii) the district court erred in refusing to depart downwardly; and (viii) the evidence proffered by the government did not support either of the money laundering convictions.[2] We examine each of these contentions in turn.

### a) *Agents' Interaction with Jury*

■ McCurvin contends first that the district court erred in concluding that the jury's interaction with Reiner and McTague was harmless. He maintains that although the jurors might have been sincere in stating that they remained impartial, they were in fact prejudiced. In his view, the agents' act of carrying into the jury-deliberation room a cart containing $27,000 in cash and narcotics improperly enhanced the credibility of their testimony in the

jurors' eyes because of their possession of the evidence. Moreover, McCurvin contends that " '[i]t is in the nature of the practices here challenged that proof of actual harm, or lack of harm, is virtually impossible to adduce.' " Appellant Br. At 10 (quoting *Peters v. Kiff,* 407 U.S. 493, 504, 92 S.Ct. 2163, 33 L.Ed.2d 83 (1972)). We find no merit in this claim.

■ As an initial matter, McCurvin failed to argue in the district court that the voir dire was insufficient to detect juror prejudice. He has, therefore, forfeited this claim, and we may reverse only if there was plain error. *See* Fed.R.Crim.P. 52(b); *United States v. Olano,* 507 U.S. 725, 731, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993). There was not. To be sure, government witnesses should not be used to carry evidence into a jury deliberation room when the jury may be present because of the risk that an improper communication might occur. However, the contact in the instant case was extremely brief and inconsequential. In light of these facts and the district court's voir dire, we fail to see how the brief exchange of "good mornings" could have prejudiced the jurors. Moreover, there was another reason to believe that no prejudice occurred. McTague was, as one of the defense attorneys argued in the trial court, "the man who put on, as a witness, basically the government's case with respect to the money laundering charges." Nevertheless, the jury acquitted McCurvin on two of these charges. These acquittals show the jury's open-mindedness on the counts associated with McTague and bolster the district court's and our conclusion that the brief exchange of greetings was entirely harmless.

### b) *Perjured Testimony of Government Witness*

■ Although McCurvin was notified three months before resentencing that one

---

**2.** Initially, McCurvin also objected to the Section 3B1.1(a) enhancement, contending that a four-level adjustment was inappropriate.

However, in his reply brief, he acknowledged that the district court had in fact imposed only a two-level enhancement.

of the government's witnesses had committed perjury by misidentifying himself, he did not move in the district court for a new trial. On appeal, McCurvin claims that a new trial should nevertheless be ordered because the witness's perjury destroyed the fairness of his trial. By not requesting a new trial in the district court, however, McCurvin forfeited this claim. *See Olano*, 507 U.S. at 731, 113 S.Ct. 1770.

█ In any event, there was no error. Where, as here, the government was unaware of a witness's perjury, a court must order a new trial only if it finds that "the jury probably would have acquitted in the absence of the false testimony." *United States v. Sanchez*, 969 F.2d 1409, 1413–14 (2d Cir.1992); *see also United States v. Locascio*, 6 F.3d 924, 949 (2d Cir.1993) (new trial is required only if newly discovered evidence is "material, non-cumulative, and would probably lead to an acquittal" (internal quotation marks omitted)). Here, the witness's true identity was not material, much less central, to the government's case. Moreover, even without the witness's testimony, the evidence of McCurvin's guilt was overwhelming, consisting of ten hand-to-hand crack sales to an undercover FBI agent, the interception of narcotics-related conversations pursuant to court-authorized wiretaps, other recorded conversations, narcotics and drug trafficking paraphernalia seized from his residence, and the testimony of another coconspirator.

#### c) *Anti-gratuity Statute*

█ McCurvin next argues that the admission of coconspirator testimony at his trial violated the so-called "anti-gratuity statute," 18 U.S.C. § 201(c)(2), because the government promised these witnesses leniency in exchange for their truthful testimony. We disagree.

█ Section 201(c)(2) provides that "[w]hoever ... directly or indirectly, gives, offers or promises anything of value to any person, for or because of the testimony under oath or affirmation given or to be given by such person as a witness upon a trial ... before any court ... shall be fined under this title or imprisoned for not more than two years, or both." 18 U.S.C. § 201(c)(2) (1994). We agree with the reasoning of the Tenth Circuit's en banc opinion, *see United States v. Singleton*, 165 F.3d 1297 (10th Cir.1999) (en banc) *cert denied*, —— U.S. ——, 119 S.Ct. 2371, —— L.Ed.2d —— (1999), and hold that 18 U.S.C. § 201(c)(2) does not apply to the United States or to any Assistant United States Attorney acting within his or her official capacity.

#### d) *Sentencing Disparity Between Crack and Cocaine*

McCurvin next claims that the disparity in the Guidelines sentences for cocaine and crack is unconstitutional. We have already rejected this argument, *see United States v. Canales*, 91 F.3d 363, 368 (2d Cir.1996); *United States v. Montoya*, 87 F.3d 621, 623 (2d Cir.1996) (per curiam), and decline to revisit the issue.

McCurvin alternatively urges application of the rule of lenity because the distinction between crack and cocaine is, he maintains, inherently ambiguous. However, the record provided the district court with ample evidence to find that McCurvin prepared and distributed crack. Thus, "[n]o ambiguity arose from the manner in which the statute was narrowly applied to" McCurvin. *Canales*, 91 F.3d at 368 (quoting *United States v. Martinez*, 49 F.3d 1398, 1404 (9th Cir.1995)).

#### e) *Evidence of Drug Quantity*

█ According to McCurvin, the evidence that he was involved with 1,314 grams of crack was legally insufficient because the crack he distributed contained caffeine. However, Section 2D1.1(c) of the Sentencing Guidelines provides that offense levels are to be determined by the weight of the mixture containing the narcotics. Except for certain circumstances not relevant here, the weight of the mix-

ture is determined without regard to the drug's purity. *See* U.S.S.G. § 2D1.1(c), Note A to Drug Quantity Table ("the weight of a controlled substance . . . refers to the entire weight of any mixture or substance containing a detectable amount of the controlled substance").

### f) *Propriety of Sentence on Conspiracy Conviction*

 McCurvin further argues that we should remand for resentencing because his sentence on the conspiracy conviction was miscalculated. He contends that, under *United States v. Orozco–Prada,* 732 F.2d 1076 (2d Cir.1984), and *United States v. Barnes,* 158 F.3d 662 (2d Cir.1998), he should have received a ten-year minimum sentence pursuant to 21 U.S.C. § 841(b)(1)(B) (applicable to an offense involving cocaine when defendant has prior drug felony conviction), rather than a twenty-year minimum sentence pursuant to 21 U.S.C. § 841(b)(1)(A) (applicable to an offense involving crack when defendant has prior drug felony conviction), because he was convicted of conspiracy to possess and distribute both cocaine and crack, and the jury returned a general guilty verdict. Both *Orozco–Prada* and *Barnes* are, however, inapposite.

In *Orozco–Prada,* the defendant was convicted of conspiracy to distribute cocaine and marijuana. The jury's verdict did not specify whether the defendant had been found guilty of a cocaine conspiracy, which carried a statutory maximum 15–year term of imprisonment, or of a marijuana conspiracy, which carried a statutory maximum 5–year term of imprisonment. We held that, in the absence of a special verdict, the defendant was entitled to the more lenient statutory maximum sentence. Accordingly, we gave the government a choice of having the defendant resentenced to a maximum 5–year term or having his conviction vacated and the case remanded for a new trial on that count. In the instant case, by contrast, the statutory maximum term is lifetime imprisonment regardless of whether McCurvin had been found guilty of a cocaine conspiracy or a crack conspiracy. The nature of the offense of conviction thus has no impact on the maximum term of imprisonment permitted by statute.

In *Barnes,* the defendant.was convicted of conspiracies to distribute, *inter alia,* heroin and crack. Although the district court arrived at a Guidelines sentencing range lower than the 20–year minimum sentence applicable to a conspiracy involving crack, it imposed the 20–year minimum. However, the statutory minimum sentence applicable to a conspiracy involving heroin was only 10 years, and we held that the district court should have "assume[d] that the conviction is for conspiracy to possess the controlled substance that carries the most lenient statutorily prescribed sentence." *Barnes,* 158 F.3d at 668. Accordingly, we again gave the government "the option of retrying the defendant (and seeking a special verdict if he chooses not to amend the indictment) or having him resentenced . . . for conspiracy to possess heroin, the controlled substance carrying the lowest mandatory minimum and permissive maximum penalty." *Id.* at 674.

Unlike *Barnes,* the Guidelines imprisonment range in the instant case was 292 to 365 months' imprisonment—higher than both the statutory 10–year minimum term urged by McCurvin and the statutory 20–year minimum term urged by the government. Thus, regardless of which statutory minimum prison term applies, McCurvin's Guidelines imprisonment range would not be altered. There is, therefore, no need to remand for resentencing on this ground. *See Edwards v. United States,* 523 U.S. 511, 118 S.Ct. 1475, 140 L.Ed.2d 703 (1998) (jury's understanding of nature of drug conspiracy is irrelevant where sentencing scheme would be same in either event).

### g) *Denial of Motion for Downward Departure*

 McCurvin contends that the district court erred in denying his motion for

a one-level downward departure based upon his stipulation to deportation. However, because there is no indication that the court misapprehended its authority to depart, its denial of the downward departure motion is not appealable. *See United States v. Brown,* 98 F.3d 690, 692 (2d Cir.1996) (per curiam).

### h) *Money Laundering Convictions*

McCurvin was charged with violating Section 1956(a)(1)(B)(i) of the federal money laundering statute, which provides that:

> Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity ... knowing that the transaction is designed in whole or in part—(i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity [shall be guilty of an offense].

One money-laundering count alleged that McCurvin violated this Section by causing his wife to put drug proceeds in a safe deposit box; another alleged that his purchase of the 1992 Acura violated the statute.

■ McCurvin asserts that there was legally insufficient evidence to support the jury's finding that his wife's placement of cash proceeds of narcotics trafficking into a safe deposit box held in her name was part of his design to conceal or disguise the nature, location, source, ownership, or control of the proceeds of specified unlawful activity. We disagree.

In reviewing a jury verdict for sufficiency of the evidence, we must uphold the conviction if "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (emphasis in original).

A defendant who challenges a jury's findings on the ground of sufficiency of the evidence "bears a very heavy burden." *United States v. Gonzalez,* 110 F.3d 936, 940 (2d Cir.1997) (internal quotation marks omitted).

The statute provides that covered transactions include "use of a safe deposit box." 18 U.S.C. § 1956(c)(3). The only question, therefore, is whether the use of the safe deposit box was caused by McCurvin and whether he caused it with the requisite intent. A rational jury could easily so find. There was ample evidence that the money in the safe deposit box was the fruit of McCurvin's drug transactions and that Antoinette placed it there at his direction so as to conceal it. Indeed, he was recorded saying just that to Jackson, and the box contained prerecorded money.

■ McCurvin also argues that the evidence was inadequate to establish that his purchase of a 1992 Acura Legend was designed to conceal or disguise drug proceeds. McCurvin was charged only with violating subsection (i) of Section 1956(a)(1)(B), and not subsection (ii) which prohibits transactions intended "to avoid a ... reporting requirement under State or Federal law." As noted, McCurvin maintains that his purchase of the car was an ordinary commercial transaction and that a money laundering conviction under Section 1956(a)(1)(B)(i) requires more than proof of the spending of the ill-gotten gains. We agree.

■ Joining a number of other circuits, we hold that Subsection (i) of the money laundering statute does not criminalize the mere spending of proceeds of specified unlawful activity. *See, e.g., United States v. Dobbs,* 63 F.3d 391, 398 (5th Cir.1995) ("where the use of the money was not disguised and the purchases were for family expenses and business expenses ..., there is ... insufficient evidence to support the money laundering conviction"); *United States v. Rockelman,* 49 F.3d 418, 422 (8th Cir.1995) (money laundering stat-

ute should not be interpreted to criminalize ordinary spending of drug sale proceeds); *United States v. Garcia–Emanuel,* 14 F.3d 1469, 1476 (10th Cir.1994) (Section 1956(a)(1) "is a concealment statute—not a spending statute"); *United States v. Sanders,* 929 F.2d 1466, 1472 (10th Cir.1991) (money laundering statute should not be interpreted to criminalize ordinary spending of drug proceeds). By its express terms, the statute requires proof that a financial transaction involving drug proceeds was designed "to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity." 18 U.S.C. § 1956(a)(1)(B)(i). Thus, absent proof of intent to conceal, an ordinary purchase made with ill-gotten gains does not violate the money laundering statute.

The government claims that it established the requisite intent to conceal by showing that McCurvin laundered money through the purchase of the Acura "by employing a bogus payment schedule" with Tri Auto. According to the government's brief on appeal, McCurvin allegedly made a large, cash downpayment in excess of the $10,000 cash reporting requirement in exchange for the automobile. Tri Auto in turn issued two receipts: one for the amount actually paid and one that reflected a payment of less than $10,000. Employment of this phony installment scheme, the government contends, evidences intent to conceal.

Had such conduct been shown, it would have been sufficient to support the jury's finding of intent to conceal. *See United States v. Kinzler,* 55 F.3d 70, 74 (2d Cir.1995) (upholding money laundering conviction on ground that defendant "did not engage in 'ordinary' commercial transactions that happened to involve the

proceeds of [illicit activity], but rather employed an elaborate plan precisely to conceal the unwelcome source of those proceeds from the credit card companies with which he dealt"). However, there is no evidence that McCurvin engaged in any such scheme when he purchased the Acura Legend.[3] To the contrary, the record reflects that McCurvin's purchase was "open and notorious," *Dobbs,* 63 F.3d at 397, that he personally closed the transaction, took title to the Acura in his name, and conspicuously used the car. There is no indication, therefore, that the drug proceeds were spent "to create the appearance of legitimate wealth" or for any purpose other than "present personal benefit." *Garcia–Emanuel,* 14 F.3d at 1474.

McCurvin may have intentionally made a downpayment of less than $10,000 in order to avoid triggering federal transaction reporting requirements. However, we hold that such a purpose is not sufficient to satisfy the "intent to conceal" requirement of Section 1956(a)(1)(B)(i). "Conceal" implies conduct entailing deception that goes beyond merely acting in a way that avoids compulsory disclosure.

Moreover, Subsection (ii) expressly criminalizes transactions designed to evade state or federal reporting requirements. A statute should be construed so that all of its parts are given effect, *see Mobil Oil Corp. v. Karbowski,* 879 F.2d 1052, 1055 (2d Cir.1989), and "a construction ascribing to two separate statutory provisions the same meaning and scope is [therefore] disfavored." *United States v. Yip,* 930 F.2d 142, 148 (2d Cir.1991). In light of these customary guides to statutory interpretation, the government's view that an intent to avoid government report-

---

3. In *United States v. Wisniewski,* 121 F.3d 54, 56 (2d Cir.1997), we upheld the money laundering conviction of the owner of Tri Auto because the evidence showed that "the dealership sold cars to a number of drug dealers, who frequently purchased cars with cash, often using names other than their own" and

that "Tri Auto routinely substituted checks for the cash payments, apparently in order to avoid cash-reporting requirements." In the instant case, however, the government proffered no evidence establishing either Tri Auto's or McCurvin's employment of such money laundering schemes.

ing requirements by itself establishes intent to conceal must be rejected. To give effect to both subsections 1956(a)(1)(B)(i) and (B)(ii), each must proscribe conduct distinct from the other. *See id.* Evidence of intent to evade a reporting requirement cannot, therefore, in and of itself satisfy the "intent to conceal" element of subsection (B)(i). The evidence proffered in the instant case thus failed as a matter of law to satisfy the scienter requirement of Subsection 1956(a)(1)(B)(i).[4]

## CONCLUSION

For the foregoing reasons, we vacate the money laundering conviction on Count 28 and remand to the district court for proceedings consistent with this opinion. We otherwise affirm in part and dismiss in part.

---

**4.** We do not reach the issue of whether the evidence in the instant case—a downpayment below the report-triggering level and installment payment arrangement in an otherwise legitimate consumer purchase—would be sufficient to support a conviction under subsection 1956(a)(1)(B)(ii).