**UNITED STATES of America,**

v.

**Jerome MACIEJEWSKI and James Best, Defendants.**

**No. 97–CR–0428.**

United States District Court, N.D. New York.

Sept. 22, 1999.

Office of the United States Attorney, Syracuse, for the United States; Steven D. Clymer, AUSA, of counsel.

Dreyer, Boyajian Law Firm, Albany, NY, for Defendant Best; William J. Dreyer, of counsel.

Brown, Pinnisi Law Firm, Ithaca, for Defendant Best; Michael D. Pinnisi, of counsel.

## MEMORANDUM—DECISION & ORDER

McAVOY, Chief Judge.

Defendant James Best ("Best") was convicted by a jury of aiding and abetting in the execution of a scheme to defraud the United States in violation of 18 U.S.C. § 2 (aiding and abetting) and the Major Fraud Act, 18 U.S.C. § 1031. Currently before the Court is Best's motion pursuant to FED. R. CRIM. P. 29 for a judgment of acquittal or, in the alternative, pursuant to FED. R. CRIM. P. 33 for a new trial.

## I. BACKGROUND

Because the Court is presented with Best's motion pursuant to FED. R. CRIM. P. 29, the following evidence is presented in the light most favorable to the government. *See Jackson v. Commonwealth of Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 2788, 61 L.Ed.2d 560 (1979); *United States v. Stephenson,* 183 F.3d 110, 113 (2d Cir. 1999).

In 1992, Jerome Maciejewski ("Maciejewski") and Best were senior executives of WholeHealth Insurance Network, Inc. ("WIN")[1], a non-profit health insurance company. WIN had divisions in Buffalo, Albany, and Binghamton. Maciejewski was the Chief Operating Officer ("COO") of WIN's Binghamton Division, known as the Upstate Medicare Division ("UMD"). Best was the COO of the Albany Division.

The Buffalo and Albany divisions were primarily involved in the sale of private health insurance policies. The UMD, however, had a contract with the Health Care Financing Administration to process claims for Part B of the Medicare Program. *See* 42 U.S.C. § 1395j, *et seq.*

The federal government contracts with "carriers" for the administration of Medicare benefits. *See* 42 U.S.C. § 1395u. The UMD was the Medicare Part B carrier responsible for processing Part B claims for health care providers in Central, Western, and Upstate New York.

Under the Medicare contract, the federal government paid WIN's costs of administering the Medicare program. *See* 42 U.S.C. § 1395u(c). However, WIN's costs pertaining to the administration of its private health insurance programs would not be paid for by the government. In order to ensure proper payments from the government, each carrier was required to report all Medicare-related costs to HCFA on a monthly and yearly basis.

In 1991 and 1992, WIN was experiencing financial difficulties. In an effort to cut costs, in 1991, WIN consolidated the mailroom operations of its three divisions into the UMD. In or about April 1992, Maciejewski was promoted to Executive Vice President and COO of WIN. Thus, he had responsibility for all three WIN divisions. Best continued to act as COO for the Albany division.

Shortly after his promotion, Maciejewski directed that fifty percent (50%) of the postage costs of WIN's private insurance business be allocated to the Medicare program. This resulted in increased costs being charged to Medicare.

Each of the three WIN divisions had a professional relations department that educated health care providers about the billing practices necessary to submit claims for payment. The UMD was primarily responsible for providing professional relations with respect to the Medicare program and, accordingly, was reimbursed by Medicare for the costs of such professional relations. The Albany and Buffalo divisions were primarily responsible for providing professional relations with respect to their private health insurance business and, thus, their provider relations costs were not reimbursable by Medicare. While the Albany division did provide some Medicare-related professional relations services until 1990, such Medicare-related activity had ceased by 1992.

In May 1992, Maciejewski instructed an employee in the Buffalo accounting department, Robert Gastle, to allocate fifty percent (50%) of the costs of the Buffalo and Albany professional relations departments to Medicare. Maciejewski also instructed that the allocation be made retroactive to January 1, 1992. Gastle relayed this information to WIN's comptroller, David Voss. Voss, however, expressed a reluctance to allocate non-Medicare costs to the Medicare program without written instructions.

1. In December 1992, WIN merged with Blue Cross of Western New York to form Blue Cross Blue Shield of Western New York.

After learning of Voss's hesitancy, Maciejewski told Gastle that he would generate a memorandum for Voss. Maciejewski also stated that he would "take care of it with Jim Best," *see* Def. Mem. of Law at 2.

On or about May 6, 1992, Maciejewski had a memorandum prepared directing Voss to reallocate fifty percent (50%) of the Buffalo division's professional relations costs to Medicare, and to make the allocation retroactive to January 1, 1992.[2] The memorandum was back-dated to February 3, 1992. The trial evidence demonstrated, however, that the Buffalo division was not, in fact, performing any Medicare-related professional relations. As a result of the memorandum, private business costs were allocated to the Medicare program.

On or about May 14, 1992, Best authored a memorandum similar to that of Maciejewski.[3] The Best memorandum requested that Voss "make the necessary adjustment in the cost allocation system to properly credit this department for its Medicare involvement." The memorandum further stated that "[s]ince the first of the year, Jerry Maciejewski has asked us to assist the Medicare B Operation by having our Professional Relations Representatives disseminate various [M]edicare information to our providers when they are making routine provider contacts and calls." As did Maciejewski, Best requested that fifty percent (50%) of the Albany division's provider relations costs be allocated to Medicare retroactive to January 1, 1992. As noted, however, in 1992, the Albany division's professional relations department had no involvement with the Medicare program. Similar to the Maciejewski memorandum, Best's memorandum was back-dated to February 18, 1992. As a result of Best's memorandum, private business costs were allocated to the Medicare program.

Based on the foregoing, and other evidence adduced at trial, Best was convicted on one count of aiding and abetting the execution of a scheme to defraud the United States in violation of 18 U.S.C. §§ 2 and 1031.

Presently before the Court is Best's motion for a judgment of acquittal pursuant to FED. R. CRIM. P. 29 or, in the alternative, a new trial pursuant to FED. R. CRIM. P. 33.

## II. DISCUSSION

### A. Rule 29 Standard

A defendant challenging the sufficiency of the evidence following a conviction bears a heavy burden. *See United States v. Ragosta*, 970 F.2d 1085, 1089 (2d Cir.), *cert. denied*, 506 U.S. 1002, 113 S.Ct. 608, 121 L.Ed.2d 543 (1992). "A conviction will be upheld if, 'after viewing the evidence in the light most favorable to the prosecution,' the reviewing court finds that 'any rational trier of fact could have found the essential elements of the crime beyond a

---

**2.** The memorandum reads as follows:

Date : February 3, 1992
To : David Voss    Subject: Professional
From: Jerry Maciejewski    Relations Activity

As you know, we have recently discussed the Professional Relations (PR) activity that Buffalo is performing for our Medicare division. With this in mind, it seems reasonable to allocate 50 percent of the PR cost centers to the Medicare division. This activity was reinstituted on January 1, 1992, therefore, this allocation should be retroactive to that date.
If you have any questions, please contact me.

**3.** The memorandum reads as follows:

Date : February 18, 1992    Subject: BSNENY Professional Relations Dep't (Cost Allocation)
From: James W. Best

Per this morning's conversation, please make the necessary adjustment in the cost allocation system to properly credit this department for its Medicare involvement. Since the first of the year, Jerry Maciejewski has asked us to assist the Medicare B Operation by having our Professional Relations Representatives disseminate various medicare information to our providers when they are making routine provider contacts and calls.
Therefore, would you please allocate 50% of the Department to the Binghamton Division retroactive to January 1, 1992.

reasonable doubt.'" *Id.* (quoting *Jackson,* 99 S.Ct. at 2789); *see also Stephenson,* 183 F.3d 110, 120 (2d Cir.1999); *United States v. Zagari,* 111 F.3d 307, 327 (2d Cir.), *cert. denied,* 522 U.S. 983, 118 S.Ct. 445, 139 L.Ed.2d 381 (1997). All reasonable inferences and all issues of credibility must be resolved in favor of the jury's verdict. *See United States v. Allah,* 130 F.3d 33, 45 (2d Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 2347, 141 L.Ed.2d 718 (1998); *United States v. Reyes,* 157 F.3d 949, 955 (2d Cir.1998).

■ Best moves for judgment of acquittal on the ground that there was insufficient evidence to establish liability under 18 U.S.C. § 2 (aiding and abetting). Specifically, Best argues that there was insufficient evidence for a fair-minded jury to conclude beyond a reasonable doubt that at the time he issued the memo to Voss he knew it was part of a scheme to defraud the government, or that he intended to defraud the government.

■ Pursuant to 18 U.S.C. § 2(a), "[w]hoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal."

> To be convicted of aiding and abetting, the defendant must have taken some conscious action that furthered the commission of the underlying crime. The government must therefore prove the underlying crime was committed by someone other than the defendant and that the defendant himself either acted or failed to act with the specific intent of advancing the commission of the underlying crime. To show specific intent the prosecution must prove the defendant knew of the proposed crime—suspicion that it might occur is not enough—and had an interest in furthering it. In sum, to prove the act and intent elements for aiding and abetting the commission of a crime, the evidence must demonstrate that the defendant joined and shared in the underlying criminal endeavor and

that his efforts contributed to its success.

*United States v. Pipola,* 83 F.3d 556, 562 (2d Cir.) (internal citations omitted), *cert. denied,* 519 U.S. 869, 117 S.Ct. 183, 136 L.Ed.2d 122 (1996). In short, to convict a defendant of aiding and abetting, the government must prove: (1) the commission of the underlying crime by a person other than the defendant; (2) that the defendant had the specific intent to assist in the commission of the underlying crime; and (3) that the defendant undertook a voluntary act or omission in order to assist the underlying crime. *See United States v. Wiley,* 846 F.2d 150, 154 (2d Cir.1988).

### 1. The Commission of the Underlying Crime by Someone Other than Best

Best does not argue that the government did not satisfy this element. Nonetheless, the government proved that the underlying substantive offense of a violation of 18 U.S.C. § 1031 was committed by Maciejewski or another. Accordingly, the government satisfied the first element of proving aider and abettor liability.

### 2. Specific Intent

The jury reasonably could have inferred from the evidence that Best knew of the proposed crime. *See United States v. Zambrano,* 776 F.2d 1091, 1097 (2d Cir. 1985). In his memorandum to Voss, Best states that "[s]ince the first of the year [January 1, 1992], Jerry Maciejewski has asked us to assist in the Medicare B Operation by having our [Albany] Professional Relations Representatives disseminate various medicare information to our providers." However, Best knew that the Albany division had not performed any Medicare-related work in 1992 and that the allocation was not justified. Best also knew that it was improper to allocate private business costs to the Medicare program without a valid reason. Thus, a reasonable jury could conclude beyond a reasonable doubt that Best was asking Voss to do something illegal—allocate

non-Medicare costs from the Albany division to the Medicare Part B program. *See id.*

Moreover, the memorandum plainly states that this was done in conjunction with requests from Maciejewski to assist in the Medicare Part B operations. Thus, a reasonable jury could conclude that Best was acting in response to discussions with Maciejewski. In light of the foregoing, it takes no great logical leap for a jury to find that Best and Maciejewski had discussed allocating the costs from the Albany professional relations division to the Medicare Part B program, that Best knew that Maciejewski intended to allocate non-Medicare costs to the Medicare Part B program, and that Best knew it was illegal. Knowing this, Best nevertheless prepared the memorandum, back-dated it, and sent it to Voss. A reasonable jury could infer from this that Best acted with the requisite intent.

The jury's conclusion is further supported by other evidence admitted at trial. For instance, Voss declined to allocate private provider relations costs to Medicare without written instructions. Maciejewski responded that he would prepare a memorandum and "take care of things with Jim Best." Thereafter, both Maciejewski and Best prepared substantially similar memoranda requesting that fifty percent (50%) of the professional relations costs of the Buffalo and Albany divisions, respectively, be allocated to the Medicare Part B program. Both Best's and Maciejewski's memoranda were prepared during the same time frame, May 1996. Furthermore, both memoranda were back-dated to February 1992. It would certainly be reasonable for a jury to find that these similarities between the Maciejewski and Best memoranda were more than coincidental. A jury could reasonably deduce from this, beyond a reasonable doubt, that Maciejewski had discussed with Best allocating non-Medicare related professional relations costs to the Medicare Part B program. Thus, the government presented sufficient evidence from which a fair-minded jury could find beyond a reasonable doubt that Best joined and shared in the underlying criminal activity.

There also was other sufficient evidence from which the jury could find, beyond a reasonable doubt, that Best acted with the intent to defraud. Best attempted to justify the allocation of non-Medicare professional relations costs to the Medicare program by falsely stating in his memorandum that he had been assisting in "the Medicare B Operation by having our Professional Relations Representatives disseminate various medicare information to our providers." However, as previously noted, Best knew that this was not true. Best knew that such a reallocation of costs would result in the federal government paying for private business costs. A jury could conclude beyond a reasonable doubt that Best had the specific intent to defraud based on the fact that he provided a false reason for allocating costs to the Medicare program. The fact that Best back-dated his memorandum is further evidence of intent. A jury could reasonably infer from the totality of the evidence before it that, by back-dating the memorandum, Best attempted to make the retroactive allocation appear legitimate; that is, that Best prepared the memorandum shortly after the Albany division purportedly began performing Medicare-related services, rather than six months after the fact.

### 3. Voluntary Act

Finally, a fair-minded jury could conclude beyond a reasonable doubt that Best's drafting (or directing the drafting) of the memorandum ordering the reallocation of private business costs to the Medicare program constituted a voluntary act to assist in the completion of the underlying crime. Although Best contends that he prepared the memorandum at Voss's request, the jury reasonably could have discounted this evidence in light of the evidence that Best was Voss's superior and, thus, Voss could not direct Best to do

anything. Furthermore, the jury reasonably could have determined that Voss was reluctant to reallocate costs to the Medicare program absent written authorization. Best provided the written authorization, thereby indicating that he initiated the authorization.

For the foregoing reasons, the Court finds that the government presented sufficient evidence from which a fairminded jury could reasonably conclude beyond a reasonable doubt that Best was guilty of aiding and abetting the commission of a major fraud against the United States in violation of 18 U.S.C. §§ 2 and 1031.

## B. Standard Under Rule 33

■ Pursuant to Rule 33, a new trial may be granted if "required in the interest of justice." FED. R. CRIM. P. 33; *see also, United States v. Moreno,* 181 F.3d 206, 212 (2d Cir.1999). The decision to grant a motion for a new trial pursuant to FED. R. CRIM. P. 33 rests within the discretion of the trial judge. *See United States v. Sanchez,* 969 F.2d 1409, 1413 (2d Cir.1992), *cert. denied,* 514 U.S. 1038, 115 S.Ct. 1404, 131 L.Ed.2d 291 (1995). Such motions are disfavored, *see United States v. Gambino,* 59 F.3d 353, 364 (2d Cir.1995), *cert. denied,* 517 U.S. 1187, 116 S.Ct. 1671, 134 L.Ed.2d 776 (1996), and should be granted only "in the most extraordinary circumstances." *United States v. Locascio,* 6 F.3d 924, 949 (2d Cir.1993), *cert. denied,* 511 U.S. 1070, 114 S.Ct. 1645, 128 L.Ed.2d 365 (1994). The burden of proving the need for a new trial lies with the defendant. *See United States v. Sasso,* 59 F.3d 341, 350 (2d Cir. 1995). In deciding a Rule 33 motion, the Court may weigh the evidence and determine the credibility of witnesses, *see Sanchez,* 969 F.2d at 1413, and is not required to view the evidence in the light most favorable to the government. *See United States v. Lincoln,* 630 F.2d 1313, 1319 (8th Cir.1980). Despite this, the Court's discretion is limited; it should only grant a new trial when it "concludes that, despite the abstract sufficiency of the evidence to sustain the verdict, the evidence preponderates sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred." *Id.*

■ Best moves for a new trial pursuant to FED. R. CRIM. P. 33 on the ground that he was prejudiced by the joint trial with Maciejewski and that the evidence preponderates heavily against the verdict. Best made similar arguments when he sought severance prior to trial, contending that it was likely that he would be found guilty by association because of the overwhelming amount of evidence against Maciejewski. The Court rejected these arguments, stating that:

> There is a strong preference for a joint trial because of the similarity of the underlying facts and Best does not set forth sufficient grounds for severance. If, at trial, Best feels that he will be prejudiced because the jury will not be able to properly distinguish the evidence against him and Maciejewski, then he may move for an appropriate limiting instruction.

At trial, the Court issued limiting instructions to the jury. Specifically, the Court instructed the jury that it should:

> give separate and personal consideration to each Defendant and to each count charged against him. In this regard, you should consider what the evidence in the case shows with respect to each Defendant and to each offense that each Defendant is charged with. In sum, each Defendant should be considered individually and each count should be considered separately.

The Court further instructed the jury that:

> There are two (2) defendants on trial before you. You must, as a matter of law, consider each count of the indictment and each defendant's involvement in that count separately, and you must return a separate verdict on each defendant for each count in which he is charged.

In reaching your verdict, bear in mind that guilt is personal and individual. Your verdict of guilty or not guilty must be based solely upon the evidence about each defendant. The case against each defendant, on each count, stands or falls upon the proof or lack of proof against that defendant alone, and your verdict as to any defendant on any count should not control your decision as to any other defendant or any other count.

Thus, the jury was adequately instructed to consider the evidence against Best separately from that against Maciejewski, and to consider only that evidence pertinent to the Count with which Best was charged as an aider and abettor. In light of the limiting instructions, and given the similarity of the underlying facts and the connection between Maciejewski and Best, it cannot be said that Best was prejudiced by a joint trial.

As previously discussed above with respect to Best's motion pursuant to Rule 29, the Court rejects the contention that the weight of the evidence preponderated in favor of acquittal. There was sufficient evidence from which a fair-minded jury could conclude beyond a reasonable doubt that Maciejewski and Best had discussed allocating private provider relations costs to the Medicare Part B program, that Best knew that allocating the Albany division's provider relations costs to the Medicare program was improper, and that Best drafted the memorandum directing that the Albany division's provider relations costs be so allocated in response to his discussions with Maciejewski.

## C. Best's Change of Attorneys

■ Approximately one month after the verdict, Best, through his trial counsel, filed the above-discussed post-trial motion, which was made returnable on the Court's September 13, 1999 motion calendar. In accordance with N.D.N.Y. L.R. 12.1(a) (Criminal Procedure), and N.D.N.Y. L.R. 7.1(b)(2), the government timely filed opposition papers. Best's trial counsel did not seek, and this Court did not grant, leave to file reply papers. *See* N.D.N.Y. L.R. 7.1(b)(2).

After the above-discussed post-trial motions had been fully briefed, filed, and made returnable on the Court's September 13, 1999 motion calendar, Best retained the services of Brown, Pinnisi & Michaels (the "Brown, Pinnisi Firm"). On September 3, 1999, the Brown, Pinnisi Firm entered their appearance on behalf of Best "in post-trial motions and, if necessary, in sentencing matters." *See* Brown, Pinnisi Notice of Appearance, Docket No. 70. By letter dated September 3, 1999, the Brown, Pinnisi Firm wrote this Court requesting a two month extension of time to "acquaint itself with the trial record ... to conduct appropriate legal and factual research ... [and to] be permitted to submit supplemental papers in support of [the post-trial] motion ... [as well as] argue additional grounds in support of the motion for new trial." Because Best's trial counsel prepared the post-trial motions, the post-trial motions had been fully briefed, there was no indication that Best's trial counsel was not representing him fully, adequately, or competently, and Best's trial counsel was obligated to continue representing him until such time as this Court permitted them to withdraw, *see* N.D.N.Y. L.R. 44.2 (Criminal Procedure), the Court denied, in part, the Brown, Pinnisi Firm's request. Because the government did not object to the Brown, Pinnisi Firm supplementing arguments in the post-trial motion, as opposed to raising new arguments, the Court permitted the Brown, Pinnisi firm to submit supplemental papers. In addressing Best's post-trial motions above, the Court considered these supplemental papers.

The Brown, Pinnisi Firm also submitted a letter requesting that the Court reconsider its denial of the previous request for an extension of time and to raise additional arguments. In this letter, the Brown, Pinnisi Firm took the liberty of setting forth the new arguments.

The Court denies the Brown, Pinnisi Firm's motion for reconsideration and declines the invitation to consider these new arguments. Even if the Court considered these submissions as part of the supplemental papers or as a Reply Brief, "new arguments may not be made in a reply brief." *The Ernst Haas Studio, Inc. v. Palm Press, Inc.*, 164 F.3d 110, 112 (2d Cir.1999). Considering these new arguments at this late stage would not allow the government an opportunity to respond. The Court cannot permit the briefing of the post-trial motions to continue *ad infinitum*. *See Tetra Technologies, Inc. v. Harter*, 823 F.Supp. 1116, 1120 (S.D.N.Y. 1993) ("Nor may entirely new but foreseeable points relevant to a motion be presented in a reply.... Were tactics of this type to be permitted, a sur-reply affidavit would be necessary from the adversary, followed by a further supplemental response by the moving party, and so on ad infinitum.").

Best, through his trial counsel, had a full and fair opportunity to present his post-trial motion. As noted, there is no indication that Best's trial counsel did not competently and adequately brief the post-trial motion. Accordingly, the Court "decline[s] to entertain the theories so proffered." *Id.*

## III. CONCLUSION

For the foregoing reasons, Best's motion for a Judgment of Acquittal pursuant to Rule 29 or, in the alternative for a new trial pursuant to Rule 33, is DENIED.

**IT IS SO ORDERED**